Alan E. Wisotsky – State Bar No. 68051
James N. Procter II – State Bar No. 96589
Jeffrey Held – State Bar No. 106991
WISOTSKY, PROCTER & SHYER
300 Esplanade Drive, Suite 1500
Oxnard, California 93036
Phone:  (805) 278-0920
Facsimile: (805) 278-0289
Email:  jheld@wps-law.net

Attorneys for Defendant,
   VENTURA COUNTY SHERIFF'S OFFICE
   *(erroneously sued as Ventura County Sheriffs Department)*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIGITAS RAULINAITIS,<br><br>    Plaintiff,<br><br>    v.<br><br>VENTURA COUNTY SHERIFFS DEPARTMENT,<br><br>    Defendant. | CASE NO. CV13-02605-MAN<br><br>**DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF CONCURRENTLY FILED MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Filed concurrently with Motion for Summary Judgment/Partial Summary Judgment, proposed Order, and proposed Judgment]<br><br>Date:    September 2, 2014<br>Time:    1:00 p.m.<br>Ctrm:    580 Roybal Building |

Defendant, VENTURA COUNTY SHERIFF'S OFFICE (erroneously sued and served as Ventura County Sheriffs Department), presents this statement of uncontroverted facts and conclusions of law in support of its concurrently filed motion for summary judgment or, in the alternative, for partial summary judgment.

/ / /

# I.

## **STATEMENT OF UNCONTROVERTED FACTS**

In accordance with Central District Local Rule 56-1, defendant and summary judgment movant, Ventura County Sheriff's Office, submits this statement of uncontroverted facts. These facts are drawn from three sources.

One source is the "Declaration of Daniel Gonzales in Support of Defendant's Summary Judgment Motion as to Initial Concealed Weapons Permit Application" (hereinafter referred to as "Gonzales Declaration 1)." The second factual source is the "Declaration of Daniel Gonzales in Support of Defendant's Summary Judgment Motion as to Second Concealed Weapons Permit Application and in Opposition to Plaintiff's Summary Judgment Motion" (hereinafter referred to as "Gonzales Declaration 2)." The third factual source is the declaration of plaintiff, Sigitas Raulinaitis, filed in connection with plaintiff's earlier summary judgment motion, on June 3, 2013 [website docket entry 13-1].

Separate Gonzales declarations are necessitated by the procedural complexities of the filings in this litigation. Plaintiff, in his existing complaint, is grieving the denial of his initial concealed weapons permit application submitted to the defendant on January 15, 2013. The summary judgment motion as to that application is addressed by Gonzales Declaration 1.

During a court conference in the nature of a hearing on plaintiff's ex parte application for issuance of a preliminary injunction, the Court allowed plaintiff to submit a second concealed weapons permit application. This order was based upon the concurrence of counsel for the two sides. In due course, plaintiff did submit a second concealed weapons permit application, on March 26, 2014. While, from a strictly technical standpoint, the denial of that second application is not truly before the Court in the traditional sense of being included as a cause of action or allegation in the complaint or an amended complaint, in a more equitable sense, it generated from the litigation, from a court conference, from an order by the Court, from the

WISOTSKY, PROCTER & SHYER
ATTORNEYS AT LAW
300 ESPLANADE DRIVE, SUITE 1500
OXNARD, CALIFORNIA 93036
TELEPHONE (805) 278-0920

concurrence of the defendant's counsel, and by the follow-through with the submission of a second application. Defendant therefore believes that it is correct and prudent to address and direct the summary judgment motion to the denied second concealed weapons permit application as well as to the initial application. Gonzales Declaration 2 addresses concealed weapons permit application No. 2. The sub-headings in this statement of uncontroverted facts are keyed to the two applications.

**A.     Facts Relating to the Initial Application of January 15, 2013**

1. Plaintiff considers his Oxnard residence to be one of his permanent homes.

   [Raulinaitis Declaration, Exhibit D, p. 2, ¶4, *l.* 5½.]

2. Plaintiff owns other homes in two other counties.

   [Raulinaitis Declaration, Exhibit D, p. 2, ¶5, *l.* 8½.]

3. Plaintiff frequently travels for both business and pleasure.

   [Raulinaitis Declaration, Exhibit D, p. 2, ¶5, *ll.* 8½ - 10.]

4. It is impossible for plaintiff to pick a California county in which he spends the majority of his time, due to the variable nature of his personal and professional life.

   [Raulinaitis Declaration, Exhibit D, p. 2, ¶6, *ll.* 11½ - 13.]

5. Daniel Gonzales is a deputy sheriff employed by the Ventura County Sheriff's Office whose assignment is concealed weapons investigation. On January 15, 2013, he received plaintiff's initial application for a license to carry a concealed weapon, and it was his responsibility to investigate it.

   [Gonzales Declaration 1, Exhibit A, ¶¶2-4.]

6. Deputy Gonzales was aware of and directed his investigation toward the Penal Code §26150(a)(3) residency requirement for a concealed weapons permit applicant. The Sheriff's Office also makes it mandatory that the applicant must be a resident of Ventura County.

   [Gonzales Declaration 1, Exhibit A, ¶¶5, 6.]

7. Deputy Gonzales's investigation revealed that Mr. Raulinaitis was not a Ventura County resident.

[Gonzales Declaration 1, Exhibit A, ¶7.]

8. Mr. Raulinaitis frankly conceded in the February 20, 2013, interview with Deputy Gonzales that he had been living at his home in Santa Clarita for the past four months almost all of the time. Santa Clarita is a city in Los Angeles County.

[Gonzales Declaration 1, Exhibit A, ¶8.]

9. Deputy Gonzales learned that Mr. Raulinaitis's driver's license showed that his address was in Burbank, a city in Los Angeles County, which turned out to be his place of business. Mr. Raulinaitis submitted his California driver's license along with his application for a concealed weapons permit, demonstrating that his address was in Burbank.

[Gonzales Declaration 1, Exhibit A, ¶9.]

10. The California Department of Motor Vehicles registration check which Deputy Gonzales requested that Ventura County Sheriff's Office's records technicians perform revealed that two of Mr. Raulinaitis's vehicles were registered to his residence address in Santa Clarita, a city in Los Angeles County, and that the other two were registered to his work address in Burbank, also in Los Angeles County.

[Gonzales Declaration 1, Exhibit A, ¶10.]

11. Mr. Raulinaitis's concealed weapons permit application listed his business address as being in Burbank.

[Gonzales Declaration 1, Exhibit A, ¶11.]

12. Mr. Raulinaitis's concealed weapons application listed his wife's residence address as being in Santa Clarita, in Los Angeles County. While not determinative of the applicant's residence address in itself, the fact that the applicant's spouse resided in another county suggested a connection with spending time in that other county, i.e., Los Angeles County.

[Gonzales Declaration 1, Exhibit A, ¶12.]

4

13. During the course of the investigation, Deputy Gonzales learned that Mr. Raulinaitis had sued Los Angeles County for denying him a concealed weapons permit about a year and a half earlier. He would have needed to have claimed Los Angeles County residency in order to qualify for a concealed weapons permit in that county.

[Gonzales Declaration 1, Exhibit A, ¶13.]

14. In order to further ascertain Mr. Raulinaitis's residency, Deputy Gonzales conducted surveillance of the Santa Clarita address which plaintiff listed in his concealed weapons permit application. On January 28, 2013, Deputy Gonzales parked his unmarked police vehicle at the end of the cul-de-sac near the Santa Clarita address listed by Mr. Raulinaitis in his concealed weapons permit application as belonging to his wife. From that vantage point, Deputy Gonzales had a clear view of the home listed by the plaintiff as his wife's residence.

[Gonzales Declaration 1, Exhibit A, ¶¶14, 15.]

15. Deputy Gonzales arrived on that date at 6:15 in the morning. At 6:43 a.m., Deputy Gonzales saw Mr. Raulinaitis leave from that house. Deputy Gonzales recognized Mr. Raulinaitis from his DMV photo, which he had obtained from a statewide database called Cal Photo.

[Gonzales Declaration 1, Exhibit A, ¶16.]

16. Deputy Gonzales then saw Mr. Raulinaitis enter his silver Infiniti, with customized California plates reading "SIG ESQ." The vehicle was parked backed into the driveway.

[Gonzales Declaration 1, Exhibit A, ¶17.]

17. The silver Infiniti was parked adjacent to Mr. Raulinaitis's wife's Toyota SUV in the driveway.

[Gonzales Declaration 1, Exhibit A, ¶18.]

18. Mr. Raulinaitis loaded a blue cooler onto the passenger seat of his vehicle, entered the car, and drove away.

[Gonzales Declaration 1, Exhibit A, ¶¶19, 20.]

19. Deputy Gonzales followed Mr. Raulinaitis to an address in Burbank, which Mr. Raulinaitis had listed in the concealed weapons permit application as his business address and which his driver's license listed as his address.

[Gonzales Declaration 1, Exhibit A, ¶21.]

20. Deputy Gonzales instructed his fellow investigator to conduct a follow-up surveillance and to report the results. Reserve Deputy Ed Jones reported to Deputy Gonzales that he saw Mr. Raulinaitis leave the home in Santa Clarita, the same address which the application listed as his wife's residence. Detective Jones stated that he saw Mr. Raulinaitis walk to the silver Infiniti, same license plate, and that he recognized Mr. Raulinaitis from his DMV photo and from the prior surveillance.

[Gonzales Declaration 1, Exhibit A, ¶¶22-24.]

21. Detective Jones's observations, relayed to lead investigator Gonzales, were made on February 1, 2013, at 6:42 a.m.

[Gonzales Declaration 1, Exhibit A, ¶25.]

22. Deputy Gonzales's personal surveillance of the address provided by Mr. Raulinaitis as his wife's, combined with the report of his partner, Detective Jones, confirmed that Mr. Raulinaitis stayed at the Santa Clarita residence from which he departed for work on the two mornings they conducted surveillance of him at that residence.

[Gonzales Declaration 1, Exhibit A, ¶26.]

23. Mr. Raulinaitis's claim to Ventura County residency was ownership of a condominium in Oxnard. When Deputy Gonzales spoke with the property manager, he was informed that she had spoken with Mr. Raulinaitis's wife, who said that they were renting the condominium to their son.

[Gonzales Declaration 1, Exhibit A, ¶28.]

///

///

6

24. On the same day as Deputy Gonzales interviewed Mr. Raulinaitis, February 20, 2013, Mr. Raulinaitis registered to vote in Ventura County.

[Gonzales Declaration 1, Exhibit A, ¶29.]

25. From his investigation, Deputy Gonzales determined that it was not reasonable to conclude that Mr. Raulinaitis was a Ventura County resident, and on that basis his application was denied.

[Gonzales Declaration 1, Exhibit A, ¶30.]

**B.** **Investigation of Plaintiff's Second Concealed Weapons Permit Application Submitted on March 26, 2014**

26. Still assigned to investigate applications for concealed weapons permits, Deputy Gonzales investigated the March 26, 2014, new concealed weapons permit application from Mr. Raulinaitis.

[Gonzales Declaration 2, Exhibit B, ¶¶2-5.]

27. Following the *Peruta* decision, there are only two conditions precedent for issuance of a concealed weapons permit, these being moral character and Ventura County residency. The third requirement, successful completion of a firearms training course, is a condition subsequent following permit issuance.

[Gonzales Declaration 2, Exhibit B, ¶6.]

28. On April 16, 2014, Deputy Gonzales began surveillance of Mr. Raulinaitis's address which he gave in his application as being in the city of Oxnard.

[Gonzales Declaration 2, Exhibit B, ¶7.]

29. At 5:30 a.m., Deputy Gonzales went to the condominium complex in Oxnard which Mr. Raulinaitis provided in the concealed weapons permit application as being his home. Driving through the outer parking lot, Deputy Gonzales did not see any vehicle registered to Mr. Raulinaitis parked in that parking lot.

[Gonzales Declaration 2, Exhibit B, ¶8.]

///

30. Deputy Gonzales then began his surveillance, which lasted continuously from 5:30 a.m. to 7:30 a.m. He did not see Mr. Raulinaitis or any of the vehicles registered to him or to his wife.

[Gonzales Declaration 2, Exhibit B, ¶9.]

31. On April 17, 2014, Deputy Gonzales again arrived at the Oxnard condominium complex at 5:24 a.m., drove through the parking lot as he had on the previous day, and again he did not see any of the vehicles registered to Mr. Raulinaitis parked in the lot or on the adjacent street.

[Gonzales Declaration 2, Exhibit B, ¶¶10, 11.]

32. Deputy Gonzales parked his vehicle and began surveillance at 5:25 a.m., which he continuously maintained to 7:30 a.m. on April 17, 2014, during which time he did not see Mr. Raulinaitis or any of the vehicles registered to him.

[Gonzales Declaration 2, Exhibit B, ¶¶12, 13.]

33. On April 18, 2014, at 5:27 a.m., Deputy Gonzales arrived at the Oxnard address listed in the concealed weapons permit application submitted by Mr. Raulinaitis, drove through the parking lot, and again did not see any of the vehicles registered to Mr. Raulinaitis.

[Gonzales Declaration 2, Exhibit B, ¶14.]

34. At 5:37 a.m., Deputy Gonzales gained access to the secured parking structure beneath the Oxnard condominium complex which Mr. Raulinaitis listed as his residence in the concealed weapons permit application. Searching through the structure, including the numbered space assigned to Mr. Raulinaitis, Deputy Gonzales did not find any vehicles registered to Mr. Raulinaitis either in the assigned space or in the entire underground parking structure.

[Gonzales Declaration 2, Exhibit B, ¶15.]

35. Continuing his surveillance until 7:00 a.m., Deputy Gonzales did not see Mr. Raulinaitis or any of the vehicles registered to him or to his wife.

[Gonzales Declaration 2, Exhibit B, ¶16.]

8

36. On April 21, 2014, Deputy Gonzales and his partner, Detective Jones, began surveillance of the Santa Clarita address which Mr. Raulinaitis listed for his wife's residence in the concealed weapons permit application. Arriving at 5:40 a.m., Deputy Gonzales saw two vehicles parked in the driveway of the house in Santa Clarita. One was the Toyota Sequoia belonging to Mr. Raulinaitis's wife. The other was the silver Infiniti with the license plate "SIG ESQ" belonging to Mr. Raulinaitis.

[Gonzales Declaration 2, Exhibit B, ¶¶17, 18.]

37. At 7:15 a.m., Deputy Gonzales and Deputy Jones saw the silver Infiniti belonging to Mr. Raulinaitis leave the cul-de-sac containing the residence where his concealed weapons permit application claimed that his wife lived.

[Gonzales Declaration 2, Exhibit B, ¶19.]

38. Deputy Gonzales and Detective Jones followed Mr. Raulinaitis's silver Infiniti and were able to positively identify Mr. Raulinaitis as the silver Infiniti's driver.

[Gonzales Declaration 2, Exhibit B, ¶20.]

39. On the following day, April 22, 2014, Deputy Gonzales and Detective Jones again conducted surveillance at the Santa Clarita address. There again were the two vehicles parked in the driveway, one being the Toyota Sequoia belonging to plaintiff's wife and the other being Mr. Raulinaitis's silver Infiniti, license plate "SIG ESQ."

[Gonzales Declaration 2, Exhibit B, ¶21.]

40. Deputy Gonzales and Detective Jones began their surveillance at 6:51 a.m. Deputy Gonzales saw Mr. Raulinaitis driving his silver Infiniti. Deputy Gonzales recognized the plaintiff from his interview of him in connection with his initial concealed weapons permit application and from his DMV photo.

[Gonzales Declaration 2, Exhibit B, ¶22.]

/ / /

/ / /

41. On April 23, 2014, Detective Jones and Deputy Gonzales went to the Santa Clarita address, where they saw the same two vehicles parked in the driveway as they had seen on the two previous days.

[Gonzales Declaration 2, Exhibit B, ¶23.]

42. At 6:51 a.m., Deputy Gonzales saw Mr. Raulinaitis driving his silver Infiniti, recognizing him as previously explained.

[Gonzales Declaration 2, Exhibit B, ¶24.]

43. On April 23, 2014, Mr. Raulinaitis drove at a very slow rate of speed, atypical of his driving behavior. He looked at Detective Jones and Deputy Gonzales, leading Deputy Gonzales to believe that Mr. Raulinaitis had become aware of their surveillance. The next day, when they arrived to conduct surveillance, Mr. Raulinaitis was not there at the Santa Clarita address.

[Gonzales Declaration 2, Exhibit B, ¶25.]

44. On May 15, 2014, Deputy Gonzales and Detective Jones knocked on doors at the Oxnard condominium complex, hoping to interview neighbors, but no one answered.

[Gonzales Declaration 2, Exhibit B, ¶26.]

45. While there, at about 4:00 p.m. that same day, Deputy Gonzales and Detective Jones checked the parking structure, but none of Mr. Raulinaitis's vehicles nor his wife's vehicle were present.

[Gonzales Declaration 2, Exhibit B, ¶27.]

46. Deputy Gonzales and Detective Jones drove to the Santa Clarita address to contact neighbors on May 15, 2014. Upon arrival, they saw the silver Infiniti, license plate "SIG ESQ," parked in the driveway of the home he listed as belonging to his wife.

[Gonzales Declaration 2, Exhibit B, ¶28.]

47. Deputy Gonzales attaches a photograph to his declaration as Exhibit C which he took on that date, May 15, 2014, at the stated time, depicting

1 Mr. Raulinaitis's silver Infiniti with the personalized plates backed into the driveway
2 of the Santa Clarita residence.

3 [Gonzales Declaration 2, Exhibit B, ¶30; Exhibit C thereto.]

4     48.    Deputy Gonzales showed the first neighbor that he and Detective Jones
5 contacted the DMV photograph of the plaintiff. The neighbor immediately recog-
6 nized Mr. Raulinaitis as being his neighbor, stating that they had been neighbors for
7 14 years. He stated that he saw Mr. Raulinaitis on a regular basis. When asked by
8 Deputy Gonzales if he knew what type of vehicle Mr. Raulinaitis drove, he correctly
9 identified it as a silver Infiniti with a custom license plate, "SIG something."

10 [Gonzales Declaration 2, Exhibit B, ¶31.]

11     49.    The next neighbor Deputy Gonzales and Detective Jones contacted was
12 also shown the DMV photograph of the plaintiff. She stated that she did not know
13 the man but did recognize his photograph. Deputy Gonzales asked her if she knew
14 where he lived. She stepped into her front yard and pointed at Mr. Raulinaitis's
15 house. She then called her son to the front door and asked him if he recognized the
16 photograph, which Deputy Gonzales showed him. He identified it as being their
17 neighbor. When asked if he knew where the man lived, he also stepped into the front
18 yard and pointed at Mr. Raulinaitis's home.

19 [Gonzales Declaration 2, Exhibit B, ¶32.]

20     50.    Speaking with a third neighbor, to whom Deputy Gonzales showed the
21 DMV photograph of the plaintiff, the neighbor identified the man as "Sig." Deputy
22 Gonzales then asked when he last saw Sig. The third neighbor said he saw Sig two
23 days earlier coming home from work. Deputy Gonzales asked the third neighbor if
24 he saw Sig on a regular basis. The neighbor replied that he saw Sig about every other
25 day, waving to him in greeting. This third neighbor also explained that he was good
26 friends with Sig's son and that they grew up together.

27 [Gonzales Declaration 2, Exhibit B, ¶33.]
28 ///

51. As Deputy Gonzales and Detective Jones were walking away, this neighbor's mother drove into the driveway. The two sheriff's investigators spoke with her, showing her the plaintiff's DMV photograph. She positively identified the man shown in the photograph as being "Sig." She said she often saw Sig. She last socialized with him in March or April of 2014 at a neighborhood function. Deputy Gonzales asked her if the silver Infiniti parked in the driveway belonged to Sig, to which she responded, "Yes."

[Gonzales Declaration 2, Exhibit B, ¶34.]

52. Detective Jones and Deputy Gonzales then went to a fourth neighbor's home, a wife and husband who lived in a home in the same neighborhood. They did not recognize Mr. Raulinaitis's DMV photograph but added that they don't socialize with any of their neighbors. While speaking with them, Deputy Gonzales noticed a vehicle in his peripheral vision. Turning around, he saw the silver Infiniti, license plate "SIG ESQ," pulling out of the driveway of the home claimed in Mr. Raulinaitis's second application for a concealed weapons permit to belong to his wife. Looking in the driver's compartment of the silver Infiniti, he recognized the driver as Sigitas Raulinaitis. Deputy Gonzales saw that Mr. Raulinaitis focused his gaze in his direction.

[Gonzales Declaration 2, Exhibit B, ¶35.]

53. Detective Jones and Deputy Gonzales went to a fifth home in the neighborhood. They interviewed a wife and husband who explained that they had moved into the neighborhood a couple of years earlier but had not yet met any of their neighbors.

[Gonzales Declaration 2, Exhibit B, ¶36.]

54. The two interviewers then went to a sixth home in the neighborhood. They showed the neighbor the DMV photograph of Mr. Raulinaitis. She identified him as "Sig." She said she sees Sig once or twice a week. Deputy Gonzales asked her if she knew the type of vehicle he drove, and she said he drove a silver Infiniti.

1 Deputy Gonzales asked her how often she saw the silver Infiniti parked in the
2 driveway, and she said, "Every day."

3    [Gonzales Declaration 2, Exhibit B, ¶37.]

4    55.   The seventh and last neighbor interviewed by the two Ventura County
5 sheriff's employees was a Los Angeles County sheriff's deputy. They showed him
6 Mr. Raulinaitis's DMV photograph, which he identified as being "Sig." As he was
7 saying, "Oh, that's Sig," he pointed to the home which Mr. Raulinaitis's concealed
8 weapons permit application identified as belonging to his wife. The neighbor said he
9 saw Sig on a regular basis.

10   [Gonzales Declaration 2, Exhibit B, ¶38.]

11   56.   Deputy Gonzales has omitted the identities of the interviewed neighbors
12 by name because it didn't seem crucial and he didn't want to violate their privacy, but
13 he can identify each of them if the Court thinks it significant.

14   [Gonzales Declaration 2, Exhibit B, ¶39.]

15   57.   The Thousand Oaks special enforcement unit of the Ventura County
16 Sheriff's Office located Mr. Raulinaitis's Twitter page, which was e-mailed to
17 Deputy Gonzales. The plaintiff's Twitter page was identified by his name, Sig
18 Raulinaitis, at the top. He wrote, "Contractor, Attorney, Broker and gun toting
19 libertarian!" On the next line, he wrote "Santa Clarita · mtibuilders.com."

20   [Gonzales Declaration 2, Exhibit B, ¶40.]

21   58.   Based upon the entirety of his investigation, Deputy Gonzales concluded
22 that Mr. Raulinaitis's residence, or, at a minimum, his primary residence, was in the
23 city of Santa Clarita in Los Angeles County. This determination contradicted
24 Mr. Raulinaitis's representation contained in his application for a concealed weapons
25 permit that he resided in the city of Oxnard.

26   [Gonzales Declaration 2, Exhibit B, ¶41.]

27   59.   Although Mr. Raulinaitis was registered to vote in Ventura County, this
28 was of extremely minimal significance, because the Registrar of Voters does not

13

require any proof of residency at all. The individual is simply requested to provide a residence address. The person is not required to show identification, a utility bill, or any other evidence that he or she actually resides in Ventura County.

[Gonzales Declaration 2, Exhibit B, ¶42.]

## II.

## **CONCLUSIONS OF LAW**

1. At the time of his initial concealed weapons permit application, January 15, 2013, plaintiff Sigitas Raulinaitis was not a resident of Ventura County as required by Penal Code Section 26150(a)(3) for granting of a permit to carry a concealed weapon.

2. At the time of his other submission of a concealed weapons permit application, on March 26, 2014, plaintiff Sigitas Raulinaitis was not a resident of Ventura County as required by Penal Code Section 26150(a)(3) to support issuance to him of a concealed weapons permit.

3. In consideration of the fact that the plaintiff has not been a resident of Ventura County within the meaning of Penal Code Section 26150(a)(3), the defendant was not required to issue a concealed weapons permit to him and was justified in denying both applications.

DATED: June 3, 2014         WISOTSKY, PROCTER & SHYER

By: _____
Jeffrey Held
Attorneys for Defendant,
VENTURA COUNTY SHERIFF'S OFFICE

Defendant's Statement of Uncontroverted Facts and Conclusions of Law in Support of Concurrently Filed Motion for Summary Judgment received/reviewed.

Dated:_____          _____
MARGARET A. NAGLE
Acting United States District Judge

14