1

2                                                                                    O

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  **SIGITAS RAULINAITIS,**            )      **NO. CV 13-2605-MAN**
                                        )
12                  **Plaintiff,**       )
                                        )
13           **v.**                      )      **ORDER GRANTING AND DENYING**
                                        )      **MOTIONS FOR SUMMARY JUDGMENT AND**
14  **VENTURA COUNTY SHERIFFS**          )      **DISMISSING CASE**
    **DEPARTMENT,**                      )
15                                      )
                    **Defendant.**       )
16  _____ )

17

18          Presently before the Court are the parties' respective motions for summary judgment.

19

20                          **PROCEDURAL HISTORY**

21

22          On April 15, 2013, plaintiff Sigitis Raulinaitis filed a civil rights complaint, pursuant to 42

23  U.S.C. § 1983 ("Complaint").  The sole defendant sued is the Ventura County Sheriff's Office

24  (named in the Complaint as the "Ventura County Sheriff's Department" and hereafter referenced

25  as the "VCSO" or "defendant").  The Complaint alleges a single claim based on the VCSO's March

26  18, 2013 denial of plaintiff's application for a permit to carry a concealed weapon.  In the

27  Complaint, plaintiff contends that the VCSO's denial of plaintiff's application has deprived plaintiff

28  of his Second Amendment right to keep and bear arms for the purpose of self defense.  As relief,

1  plaintiff seeks an order requiring the VCSO to issue to him a permit to carry a concealed weapon,

2  as well as an award of costs and attorney's fees pursuant to 42 U.S.C. § 1988.  On May 6, 2013,

3  defendant VCSO filed an Answer to the Complaint.  On May 9, 2013, the parties consented to

4  proceed before the undersigned pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b).

5

6  On May 28, 2013, the parties filed a Joint Case Management Statement And Factual

7  Stipulation, which set forth some of their respective legal and factual contentions, several

8  stipulated facts, and two disputed legal issues.  Based on the parties' express factual stipulations,

9  the Court issued a Case Management Order on May 31, 2013, which found that the following facts

10  are deemed admitted by all parties:

11

12      a.      Plaintiff applied for and was denied a permit for a concealed weapon by

13              Defendant, because he was not a resident of Ventura County.

14

15      b.      Defendant defines residence as:  The County in which a person spends most

16              of his or her time and conducts most of his or her activities.

17

18      c.      Defendant determined that Plaintiff did not meet the standards for this

19              definition, and Plaintiff agrees that he does not meet the terms of this

20              definition.

21

22      d.      Plaintiff owns and maintains a home in Ventura County.  Plaintiff also

23              maintains homes in Los Angeles and San Bernardino County.

24

25  (Docket No. 12; *see* Docket No. 11 at 2, in which the parties explicitly stipulate to these same

26  factual matters.)

27

28  On June 3, 2013, plaintiff filed a motion for summary judgment, pursuant to Rule 56 of the

Federal Rules of Civil Procedure, an opening brief, and an unsigned declaration of plaintiff ("First Motion").  On June 5, 2013, plaintiff lodged his original signed declaration dated June 3, 2013 ("First Plaintiff Decl.").

On June 14, 2013, defendant filed an opposition to the First Motion, which included:  a responsive brief; the May 2013 declaration of Daniel Gonzales, a VCSO deputy sheriff ("First Gonzales Decl."); and Exhibits A-J (collectively, the "First Opposition").  On June 17, 2013, the parties filed a stipulation to remove Exhibits C through J of the First Opposition from the Court's public website and to allow them to be filed under seal.  On June 17, 2013, the Court issued an Order granting the requested relief and Exhibits C through J were filed under seal on June 19, 2013.[1]

On June 19, 2013, plaintiff filed a reply, which contained a one-page Objection to the Gonzales Declaration ("Reply").  On June 28, 2013, defendant filed a reply.  On the same day, plaintiff filed a sur-reply.

On December 31, 2013, the Court issued an Order that denied the First Motion ("First SJ Order").  In brief, the Court found that plaintiff had not met his burden of showing he was entitled to judgment as a matter of law with respect to the issue presented by the First Motion, *i.e.,* whether the VCSO erred in its interpretation and application of the California Penal Code § 26150 residency requirement (discussed in detail below) in connection with the denial of plaintiff's application for a permit to carry a concealed weapon.  The First SJ Order did not reach or resolve the question of whether the denial of plaintiff's application violated his Second Amendment rights,

---

[1]     The Court granted the parties' request to file these exhibits under seal because some of them contained information that could be deemed private or sensitive, such as personal information about plaintiff and his wife, including telephone numbers, addresses, copy of driver's license and other DMV information, vehicle records, etc.  However, not all of the information included within the documents filed under seal is private or sensitive, and thus, the non-private matters may be referenced herein.

1   because that issue was not presented by the First Motion and the parties' related briefing.

2

3       Plaintiff did not seek reconsideration of the First SJ Order.  Although the Court expressly

4   afforded plaintiff the opportunity to file a belated motion for reconsideration, plaintiff advised the

5   Court that he did not wish to do so.  (*See* Docket No. 50.)

6

7       Following the issuance of the First SJ Order, various proceedings ensued.  Defendant filed

8   a motion for judgment on the pleadings, which ultimately was withdrawn.  Plaintiff filed an ex

9   parte application for a temporary restraining order, which the Court denied on April 23, 2014.  As

10  discussed below, plaintiff filed a second application with the VCSO for a permit to carry a

11  concealed weapon, and that second application was denied.

12

13      On May 12, 2014, plaintiff filed a second motion for summary judgment ("Second Motion").

14  The Second Motion was accompanied by a Statement of Uncontroverted Facts and Conclusions

15  of Law and another declaration by plaintiff, which is dated May 12, 2014 ("Second Plaintiff

16  Decl.").[2]  On June 3, 2014, in opposition to the Second Motion, defendant filed a memorandum

17  of points and authorities ("Second Opposition") accompanied by exhibits -- which include as

18  Exhibit A a declaration by Deputy Sheriff Gonzales dated May 19, 2014 ("Second Gonzales Decl.")

19  and as Exhibit B a declaration by Deputy Sheriff Gonzales dated May 19, 2014 ("Third Gonzales

20  Decl.") -- as well as a Statement of Genuine Disputes in compliance with Local Rule 56-2.

21

22      On June 3, 2014, defendant filed a motion for summary judgment, which included a

23  memorandum of points and authorities with appended exhibits, including the Second and Third

24  Gonzales Declarations (collectively, Defendant's Motion"), and a Statement of Uncontroverted

25  Facts and Conclusions of Law.  On June 3, 2014, plaintiff filed an Opposition to Defendants'

26

27      [2]     Defendant promptly filed an Objection to the Second Motion, asking that it be
28  stricken (*see* Docket No. 54).  While the Court is sympathetic to the concerns raised by defendant,
    it declines to strike the Second Motion and will resolve the Second Motion on its merits.

1   Motion.[3]  Plaintiff did not file a Statement of Genuine Disputes as required by Local Rule 56-2.

2   Accordingly, on July 23, 2014, the Court issued an Order that apprised the parties as follows:

3

4       [B]ecause plaintiff did not file and serve, along with his opposition to defendant's

5       motion for summary judgment, "a separate document containing a concise

6       'Statement of Genuine Disputes' setting forth all material facts as to which it is

7       contended there exists a genuine dispute necessary to be litigated," in accordance

8       with Local Rule 56-2, the Court "may assume that the material facts as claimed and

9       adequately supported by [defendant in his "Statement Of Uncontroverted Facts And

10      Conclusions of Law . . ." filed on June 3, 2014; Docket No. 61] are admitted [by

11      plaintiff] to exist without controversy," in accordance with Local Rule 56-3.

12

13      On August 25, 2014, plaintiff filed a Notice of Decision, which asks the Court to take notice,

14  in connection with the pending Second Motion and Defendant's Motion, of a decision issued that

15  day by the United States District Court for the Eastern District of California in *Silvester v. Harris*,

16  11-CV-2137-AWI SAB.  On August 26, 2014, the Court issued an Order regarding the Notice of

17  Decision, stating that "[i]f plaintiff believes that the *Silvester* decision is relevant to the Court's

18  consideration of the pending summary judgment motions in this case, plaintiff shall file and serve

19  a brief explaining the relevancy of the decision within ten (10) days of this Order" and affording

20  defendant time to file a reply.  In e-mail correspondence with the Court's Deputy Clerk, plaintiff's

21  counsel indicated that he declined to file such a brief.  Nonetheless, the Court has carefully

22  reviewed and considered the August 25, 2014 decision in the *Silvester* case.

23

24      On September 3, 2014, plaintiff filed another Notice of Decision, which asks this Court to

25

26          [3]      Plaintiff labeled this filing (Docket No. 65) both an Opposition to Defendant's Motion
    and a Reply Brief regarding the Second Motion.  However, on June 2, 2014 (Docket No. 56), the
27  parties stipulated that they waived filing reply briefs and would not file reply memoranda.
    Accordingly, the Court will treat plaintiff's June 3, 2014 filing as solely an Opposition to
28  Defendant's Motion.

take judicial notice of a Report and Recommendation which issued that day in a case in this district entitled *Jonathan Birdt v. San Bernardino Sheriff's Department*, EDCV 13-00673-VAP (JEM). On September 4, 2014, a member of the Clerk's Office struck the Notice of Decision for procedural deficiencies.  Nonetheless, pursuant to Rule 201 of the Federal Rules of Evidence, the Court has taken judicial notice of the September 3, 2014 Report and Recommendation in the *Birdt* case, as that document is a judicial record filed in this district.

## THE APPLICABLE LEGAL STANDARDS

Summary judgment is appropriate when the evidence demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party has the burden of establishing the absence of a triable issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 242, 323 (1986). The "test is whether a 'reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that the plaintiff is entitled to a favorable verdict.'"  Pyramid Technologies, Inc. v. Hartford Ca. Ins. Co., 752 F.3d 807, 818 (9th Cir. 2014) (citation omitted). A moving party without the ultimate burden of persuasion at trial may carry its initial burden of production by one of two methods.  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).  "The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial."  *Id.*  The moving party, however, need not disprove the other party's case.  Celotex, 417 U.S. at 323-24.

Once the moving party has met its burden, the burden shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial.  Celotex, 477 U.S. at 324. The nonmoving party must submit some evidence establishing the elements essential to that party's case for which that party will bear the burden of proof at trial.  *Id.* at 322.  The nonmoving

party is "required to present significant probative evidence tending to support [his] allegations." Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (internal quotation marks omitted).  "The mere existence of a scintilla of evidence" is insufficient to raise a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  When the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); see also T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987) ("the court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence").

## SUMMARY OF THE EVIDENCE PRESENTED BY THE PARTIES

As noted above, the following facts have been stipulated to in this case.  The VCSO denied plaintiff's first application for a permit to carry a concealed weapon ("CCWP") on the ground that plaintiff is not a resident of Ventura County.  In reviewing plaintiff's application, the VCSO concluded that plaintiff, who owns and maintains homes in Ventura, Los Angeles, and San Bernardino Counties, does not meet the VCSO's definition of "resident," i.e., a person who spends most of his or her time and conducts most of his or her activities within Ventura County.  The Court relied on the parties' stipulation regarding these facts in connection with the First SJ Order, and neither party has sought to be relieved from such factual stipulations.  Accordingly, these factual stipulations are binding for purposes of the instant summary judgment motions.  The Court, of course, also has considered the additional evidence submitted by the parties in support of their respective pending Motions.  Plaintiff has failed to dispute the factual assertions set forth in defendant's Statement of Uncontroverted Facts, notwithstanding the Court's advice to plaintiff of the consequences should he fail to do so.  Accordingly, pursuant to Local Rule 56-3, the Court may assume that the "uncontroverted" facts proffered by defendant are admitted by plaintiff and, thus, are true to the extent they are adequately supported.  Further, pursuant to Rule 56(c)(3),

the Court has considered the evidence submitted by the parties in connection with the First Motion, as such evidence is part of the record in this case.   The relevant evidence, taken as a whole, is as follows:

*Plaintiff's Proffered Evidence:*

The only evidence proffered by plaintiff -- both to support his Second Motion and to oppose Defendant's Motion -- are his First and Second Declarations.[4]

In his First Declaration, plaintiff asserts the following facts.   In June 2012, he purchased a home in the City of Oxnard, which is within Ventura County, and moved his personal effects into the home (the "Oxnard Home").   Other than family members and invited guests, no one else rents or uses the Oxnard Home.   Plaintiff maintains and pays for the utilities for the Oxnard Home. (First Plaintiff Decl. ¶ 2.)   On an unspecified date after June 2012, plaintiff "updated [his] voter registration to Ventura County," and at the time of the declaration, he intended to vote in the next election for the Ventura County Sheriff and any other election in Ventura County.[5]   (*Id.* ¶¶ 2-3.) Plaintiff considers the Oxnard Home to be "one of [his] permanent homes" and a place to which he always intends to return and frequently does return.   Plaintiff owns homes in two other counties and frequently travels for business and pleasure.   (*Id.* ¶¶ 4-5.)   Because plaintiff's

---

[4]      In plaintiff's Reply to the First Motion (at 5, 6) and in plaintiff's present Opposition to Defendant's Motion (at 2-3, 7), his counsel has made numerous unsworn factual assertions that lack *any* evidentiary support.   Indeed, plaintiff's counsel would not be competent to attest to these matters even had he attempted to do so, because they are matters within plaintiff's personal knowledge, not within his counsel's knowledge.   In its First SJ Order, the Court advised plaintiff's counsel of the ineffective nature of his unsupported factual assertions, yet counsel has repeated and compounded this obvious defect in connection with the presently pending Motions.   Because these unsworn allegations by counsel lack any evidentiary support, they are not competent to establish or controvert any fact and, thus, cannot be considered.   *See* Fed. R. Civ. P. 56(c)(1)(A).

[5]      In its Answer, the VCSO admits that plaintiff registered to vote in Ventura County "on the day of his interview with detectives."   As discussed *infra*, that date was February 20, 2013. There is no evidence that plaintiff has ever voted in an election in Ventura County.

personal and professional life is of a "variable nature," "it is impossible" to designate any County in California as the one in which he spends the majority of his time.  (*Id.* ¶ 6.)

In his First Declaration, plaintiff further asserts that his declaration coupled with the "physical acts of moving and the legal registering to vote" -- on their own -- are sufficient to prove he is a resident of Ventura County for purposes of his CCWP application.  Plaintiff contends that the VCSO is prohibited from conducting any additional investigation into the residency issue, because doing so would violate plaintiff's state constitutional right to privacy.  (First Declaration ¶ 7.)[6]

In his Second Declaration, plaintiff asserts, in material part, that:  he is "a resident and domiciliary of Ventura [C]ounty where [he] maintain[s] [his] primary home [which is] registered with the DMV as my residence and with the Secretary of State to vote" (Second Plaintiff Decl. ¶ 1); if he is absent from his Oxnard Home, it remains his permanent home where he plans on returning (*id.*); Ventura is where he "remain[s] when not called elsewhere for labor or other special or temporary purpose, and to which [he] return[s] in seasons of repose" (¶ 2); and he intends to remain in Ventura and, when he is absent, he intends to return (¶ 4).  Thus, while plaintiff initially stated, under oath, that his Oxnard Home was "one of" his several "permanent" homes and not his sole permanent home and that he does not spend the majority of his time at any of his three homes, he now contends otherwise.  Plaintiff, however, does not assert that his factual circumstances have changed since June 3, 2013, the date on which he signed the First Declaration, nor does he explain the inconsistency between his sworn statements.

---

[6]     Plaintiff repeated this assertion in his Opposition to Defendant's Motion (at 7), *i.e.,* he argues that the VCSO was limited to considering plaintiff's declaration and his voter and DMV registration and that it was improper for the VCSO to conduct any investigation.  Inconsistently, however, in that same Opposition (at 2), plaintiff faults defendant for failing to conduct additional investigation -- including because the VCSO failed to re-interview plaintiff and obtain copies of documents such as his personal schedule -- when he re-applied for a CCWP in 2014.

*Defendant's Proffered Evidence:*

   *The First Application*

   Gonzales is a deputy sheriff of the VCSO. Since June 2012, he has been responsible for evaluating CCWP applications submitted in Ventura County. (Second Gonzales Decl. ¶¶ 1-2.) As of June 2013, Gonzales's practice is to examine first whether an applicant satisfies the residency requirements for a CCWP,[7] because if the residency requirement is not satisfied, there is no need to conduct an assessment of the additional requirements for obtaining a CCWP. (First Gonzales Decl. ¶ 8.)

   On January 15, 2013, Plaintiff submitted his first application for a CCWP to the VCSO (the "First Application"), and Gonzales was responsible for investigating the First Application. (Second Gonzales Decl. ¶ 4.) Gonzales interviewed plaintiff on February 20, 2013. During the interview, plaintiff indicated that: he had obtained a CCWP from Arizona six months earlier; and in October 2010, he had applied for a CCWP from Los Angeles County, but his application was denied on the ground that good cause was lacking. (First Gonzales Decl. ¶ 10, Ex. C at 1.) Plaintiff stated that: he is employed as a contractor, broker, and attorney; his office is in Burbank; but most of his work involves contracting, which he performs "all over" in multiple California counties. (*Id.* at 4-5.) Plaintiff further stated that his wife lived at their Santa Clarita home (located in Los Angeles County), which they were remodeling and planning to place on the rental market. (*Id.* at 3, 5.) Plaintiff indicated that his son lived in the Oxnard Home with plaintiff,[8] and plaintiff's wife "spent a better part of the summer" at the one-bedroom Oxnard Home with plaintiff and his son, because

---

   [7]   California's residency requirement for CCWPs is discussed *infra*. As California law requires, the VCSO's policy for issuing CCWPs requires that an applicant be a resident of Ventura County. (Second Gonzales Decl. ¶ 6.)

   [8]   The Oxnard Home is a one-bedroom condominium unit. Plaintiff stated that he slept in the bedroom and his son slept in the living room. (First Gonzales Decl., Ex. C at 6.) Plaintiff paid all the utility bills for the Oxnard Home. (*Id.*)

it is cooler than their Santa Clarita home.  During the winter, plaintiff and his wife "go a lot" to their Big Bear home in San Bernardino County.  (*Id.* at 5.)  When asked how much time he had spent at the Oxnard Home during the past month, plaintiff replied "probably just several days," because he had been spending more time in Santa Clarita while working there.[9]  (*Id.*)  Plaintiff stated that where he lives "varies"; he spends time at the Santa Clarita house; in the summer, he spends time at the Oxnard Home; and in the winter, he and his wife "go a lot to" their Big Bear home.  (*Id.*)

When Gonzales disclosed that his investigation to date indicated plaintiff spent more time in Santa Clarita than in Ventura County, plaintiff responded,  "[W]ell I would say over the past 4 months that's true but I would say over the you know, after I bought the place [in Oxnard] I was over probably literally four months almost all the time."  (First Gonzales Decl., Ex. C at 6.)  Plaintiff stated that he was registered to vote in Ventura County, and he changed his registration to vote at the same time he changed his address with the DMV.  (*Id.*)

Gonzales advised plaintiff that the Ventura County Sheriff took the residency requirement seriously, especially when faced with what appeared to be a dual residency situation.  (First Gonzales Declaration, Ex. C at 6.)  Gonzales stated that Ventura County had experienced a number of instances in which Los Angeles residents attempted to obtain CCWPs in Ventura County by claiming residence in Ventura County, because they perceived it as easier to obtain a CCWP in Ventura County than in Los Angeles County.  (*Id.*)  Gonzales also advised plaintiff that a further investigation would be conducted by the VCSO, because it appeared that plaintiff did not spend as much time in Ventura County as he did in Santa Clarita.  (*Id.*)  Plaintiff responded, "[L]ike I said[,] currently that would be true[;] it's my intention to get [the Santa Clarita home] rented out then I will be[,] I can't say that's not true at the current moment."  (*Id.* at 7.)  Plaintiff then said

---

[9]      During the interview, plaintiff at times referred to Canyon Country and at other times to Santa Clarita.  Canyon Country is an area within Santa Clarita, and it appears that plaintiff's references to "Canyon Country" were to his Santa Clarita home.

1   that, had the interview taken place in July or August, he would have responded that, over the past

2   three months, he was at the Oxnard Home 80 percent of the time and at his Santa Clarita home

3   20 percent of the time.  (*Id.*)  Plaintiff stated that under the Ventura Sheriff's definition of

4   residence as explained by Gonzales -- *i.e.,* "where you sleep" and "where you spend most of your

5   time" -- plaintiff's residency varied "depending on the time of year."  (*Id.*)

7   At the time Gonzales conducted his investigation concerning plaintiff's First Application,

8   plaintiff's driver's license listed a Burbank address in Los Angeles County, which is the same

9   address listed on his First Application as his business address.  (First Gonzales Decl. ¶ 11, Ex. D;

10   Second Gonzales Decl. ¶¶ 9, 11.)  California DMV records showed that two of plaintiff's cars were

11   registered to his Santa Clarita home address, and his other two cars were registered to his

12   Burbank work address.  (First Gonzales Decl. ¶ 12, Exs. E-H; Second Gonzales Decl. ¶ 10.)  The

13   First Application listed the address for the Oxnard Home as plaintiff's residence address, the

14   Burbank business address as plaintiff's mailing address, and the Santa Clarita home address as

15   his wife's address.  (First Gonzales Decl. ¶ 14, Ex. I at 5; Second Gonzales Decl. ¶ 12.)

17   During his investigation related to the First Application, Gonzales learned that, about a year

18   and a half earlier, plaintiff had sued Los Angeles County for denying his CCWP application.  When

19   plaintiff applied for a CCWP in Los Angeles County, he necessarily would have claimed that he was

20   a resident of Los Angeles County, or had his principal place of business or employment in Los

21   Angeles County, in order to qualify for a permit.  (First Gonzales Decl. ¶ 7; Second Gonzales Decl.

22   ¶ 13.)  Plaintiff, in fact, did so claim.[10]

24          [10]        Pursuant to Rule 201 of the Federal Rules of Evidence, the Court takes judicial notice
25   of its records and files in that lawsuit -- *Raulinaitis v. Los Angeles County Sheriffs Department, et
     al.*, CV 11-8026-MWF (JCG).  In that case, both plaintiff and his wife filed a civil rights complaint
26   in this district after the Los Angeles Sheriffs Department denied their applications for CCWPs on
     the ground that the good cause requirement was not met.  Plaintiff and his wife claimed that the
27   Los Angeles Sheriff's policy regarding the "good cause" requirement violated the Second
     Amendment.  On August 13, 2012, the defense motion for summary judgment was granted.
28   Plaintiff and his wife appealed, and their appeal apparently remains pending (Ninth Circuit Case

1    Gonzales also learned that plaintiff had not registered to vote in Ventura County until

2    February 20, 2013, the same day he was interviewed by Gonzales. Prior to that date, and

3    including on the date he submitted the First Application, plaintiff was not registered to vote in

4    Ventura County. (First Gonzales Decl. ¶ 31; Second Gonzales Decl. ¶ 29.)

5

6    To assess whether the residency requirement was met, Gonzales conducted surveillance

7    of plaintiff's Santa Clarita home on January 28, 2013. At 6:15 a.m., Gonzales parked his car at

8    the end of the cul-de-sac on which the home is located. From his car, Gonzales observed plaintiff

9    leave the Santa Clarita home at 6:43 a.m., load a cooler into his Infiniti parked in the driveway

10   (which was parked next to the car registered to plaintiff's wife), and drive to his Burbank office

11   address. (Gonzales Decl. ¶¶ 16-23; Second Gonzales Dec. ¶¶ 14-21.)[11]

12   _____

13   No. 12-56508).

14   In his application submitted to the Los Angeles Sheriff's Department, plaintiff
     represented that he was a resident of Santa Clarita, California. (*See* CV 11-8026 Docket No. 18
15   at 30, 37.) In his Complaint, he repeatedly alleged that he was a resident of Santa Clarita,
     California. (*See id.* Docket No. 1 at 1-3.) The Court notes, however, that plaintiff did not own the
16   Oxnard Home at the time his Los Angeles County CCWP application was denied and he initiated
17   his related lawsuit.

18   [11]    Gonzales instructed one of his fellow investigators (Ed Jones) to conduct a follow-up
     surveillance. Jones reported to Gonzales that, on February 1, 2013, at 6:42 a.m., Jones observed
19   plaintiff leave the Santa Clarita home and get into his Infiniti. (First Gonzales Decl. ¶¶ 24-27;
     Second Gonzales Decl. ¶¶ 22-25.) Gonzales also spoke to the property manager for the
20   condominium complex in which the Oxnard Home is located and was advised that plaintiff's wife
21   told the property manager that she and plaintiff were renting the condominium to their son. (First
     Gonzales Decl. ¶ 30; Second Gonzales Decl. ¶ 28.)
22

23   In connection with the First Motion, plaintiff objected, on hearsay grounds, to the
     portions of the First Gonzales Declaration setting forth what Gonzales was told by Jones and the
24   condominium complex property manager. When defendant repeated these factual assertions in
     its Statement of Uncontroverted Facts filed in support of Defendant's Motion, plaintiff declined to
25   controvert them. In his declarations, Gonzales has stated this information formed a part of his
26   conclusion that plaintiff was not a Ventura County resident. (First Gonzales Decl. ¶ 32; Second
     Gonzales Decl. ¶¶ 26, 30.) While the Court notes Gonzales's statements regarding information
27   he obtained from Jones and the unnamed property manager, and while these factual assertions
     could be assumed to be true given plaintiff's failure to controvert them, the Court has not
28   considered such information in ruling on the pending Motions.

Gonzales concluded that, based on the foregoing matters, "it was not reasonable to conclude that [plaintiff] was a Ventura County resident." The First Application was denied on that ground alone, and thus, Gonzales did not investigate or determine the additional good cause and moral character requirements. (First Gonzales Decl. ¶¶ 9, 32; Second Gonzales Decl. ¶¶ 7, 30.)

*The Second Application*

During the course of this litigation, plaintiff submitted a new CCWP application to the VCSO, which Gonzales received on March 26, 2014 (the "Second Application"). As before, Gonzales was responsible for investigating the Second Application. (Third Gonzales Declaration ¶¶ 4-5.)

On April 16, 2014, Gonzales went to the Oxnard Home to conduct surveillance from 5:30 a.m. through 7:30 a.m. Gonzales drove through the outer parking lot of the condominium complex but did not see plaintiff's car or his wife's car. (Third Gonzales Decl. ¶¶ 7-9.)

On April 17, 2014, Gonzales again went to the Oxnard Home to conduct surveillance from 5:25 a.m. through 7:30 a.m. As before, Gonzales drove through the outer parking lot of the condominium complex but did not see any car registered to plaintiff. (Third Gonzales Decl. ¶¶ 10-13.)

On April 18, 2014, at 5:27 a.m., Gonzales arrived at the Oxnard Home condominium complex to conduct further surveillance. Gonzales drove through the outer parking lot of the condominium complex but did not see any car registered to plaintiff. At 5:37 a.m., Gonzales accessed the secured parking structure beneath the complex, searched it (including plaintiff's assigned parking spot), and did not see any car registered to plaintiff. Gonzales's surveillance concluded at 7:00 a.m., by which time he still had not seen plaintiff or any of the cars registered to him or his wife. (Third Gonzales Decl. ¶¶ 14-16.)

1    On April 21, 2014, at 5:40 a.m., Gonzales and Detective Jones commenced surveillance of
2    plaintiff's Santa Clarita house.  Gonzales saw two cars parked in that home's driveway -- the car
3    registered to plaintiff's wife and the Infiniti registered to plaintiff.  At 7:15 a.m., Gonzales saw the
4    Infiniti leave; he and Jones followed it and confirmed that plaintiff was driving the car.  (Third
5    Gonzales Decl. ¶¶ 17-20.)

6

7    On April 22, 2014, at 6:51 a.m., Gonzales and Detective Jones again conducted a
8    surveillance of plaintiff's Santa Clarita house.  The same two cars were parked in the driveway of
9    that home.  Gonzales saw plaintiff drive away in the Infiniti. (Third Gonzales Decl. ¶¶ 21-22.)

10

11    On April 23, 2014, Gonzales and Detective Jones again went to plaintiff's Santa Clarita
12    house and observed the same two cars were parked in the driveway of that home.  At 6:51 a.m.,
13    Gonzales saw plaintiff drive away in the Infiniti.  Unlike on the prior two days, plaintiff drove very
14    slowly and looked at Gonzales and Jones.  Gonzales believes that plaintiff became aware of the
15    surveillance at that time.  When Gonzales and Jones went to the home the next morning to
16    conduct surveillance, plaintiff was not there.  (Third Gonzales Decl. ¶¶ 23-25.)

17

18    On May 15, 2014, at 4:00 p.m., Gonzales and Detective Jones went to the Oxnard Home
19    condominium complex.  They knocked on doors hoping to interview neighbors, but no one
20    answered.  They checked the parking structure and did not see either plaintiff's car or his wife's
21    car.  (Third Gonzales Decl. ¶¶ 26-27.)

22

23    On May 15, 2014, Gonzales and Detective Jones went to the neighborhood in which the
24    Santa Clarita home is located area to speak with neighbors.  Gonzales observed that plaintiff's
25    Infiniti was backed into and parked in the driveway of the Santa Clarita home, and at 6:33 p.m.,
26    Detective Jones placed his hand next to the front engine grille and observed heat emanating from
27    the engine.  (Third Gonzales Decl. ¶¶ 28-30, Ex. C.)  While interviewing neighbors, Gonzales saw
28

plaintiff drive out of his driveway in the Infiniti and look at Gonzales.  (*Id.* ¶¶ 35-36.)[12]

Gonzales also viewed an e-mail of plaintiff's Twitter page, which was obtained and sent to him by another unit in the VCSO.  That Twitter page lists Santa Clarita as plaintiff's location. (Third Gonzales Decl. ¶ 40.)[13]

---

[12]  During that May 15, 2014 Santa Clarita visit, Gonzales showed plaintiff's DMV photograph to a neighbor.  The neighbor immediately recognized plaintiff and said they had been neighbors for 14 years and he saw plaintiff on a regular basis.  He identified the Infiniti as plaintiff's car.  (Third Gonzales Decl. ¶ 31.)  The second neighbor Gonzales spoke with, and her son, both recognized plaintiff's photograph and pointed to the Santa Clarita home as the place where plaintiff lived.  (*Id.* ¶ 32.)

Gonzales spoke with a third neighbor who, upon viewing the DMV photograph of plaintiff, identified him as "Sig" and said he last saw plaintiff two days ago coming home from work.  When asked if he saw plaintiff on a regular basis, the neighbor said he saw plaintiff about every other day and would wave to him in greeting.  (Third Gonzales Decl. ¶ 33.)  The neighbor's mother then drove up, and she also identified plaintiff as the man in the DMV photograph and the Infiniti as his car, and said she often saw plaintiff and last socialized with him in March or April at a neighborhood function.  (*Id.* ¶ 34.)  Gonzales and Detective Jones then interviewed two sets of additional neighbors, neither of whom recognized plaintiff; the first indicated they do not socialize with their neighbors, and the second indicated that they had not met any of their neighbors.  The next neighbor interviewed identified the man in the DMV photograph as "Sig" and stated that she sees him once or twice a week and sees his Infiniti parked in his driveway every day.  (*Id.* ¶ 37.)  The final neighbor interviewed also identified the photograph as "Sig" and the Santa Clarita home as belonging to plaintiff, and noted that he sees plaintiff on a regular basis.  (*Id.* ¶ 38.)  Gonzales states that he can identify the names of the neighbors with whom he spoke, but their names were omitted from his declaration for privacy reasons.  (*Id.* ¶ 39.)

In his Opposition to Defendant's Motion (at 2), plaintiff vaguely asserts that he "objects" to Gonzales's description of his interviews and failure to identify the neighbors but plaintiff fails to identify the basis for his objection.  Significantly, plaintiff failed to controvert the inclusion of this evidence in defendant's Statement of Uncontroverted Facts.  Although the Court notes that these neighbor comments are included in the Third Gonzales Declaration and may be presumed to be true facts given plaintiff's failure to controvert them, the Court has not considered these statements in ruling on the pending Motions.

[13]  Defendant did not produce a screen capture of that Twitter page, but it was readily viewable by the Court at https://twitter.com/sighere <viewed September 18, 2014>.  On it, plaintiff listed Santa Clarita as his location.  The Court notes, however, that when this Twitter page was re-viewed on September 30, 2014, plaintiff had changed his location to Channel Islands, California.

Based upon the entirety of his investigation, Gonzales concluded that plaintiff's primary residence is his Santa Clarita home, contrary to the representation on the Second Application that plaintiff resides in Oxnard. (Third Gonzales Decl. ¶ 41.) Gonzales ascribed "minimal significance" to the fact that plaintiff is registered to vote in Ventura County, because no proof of residency (other than simply writing down a residence address) is required to register to vote. (*Id.* ¶ 42.)

## DISCUSSION

As filed, this case stems from defendant's denial of the First Application on the ground that plaintiff was not a "resident" of Ventura County, as required by California law, specifically California Penal Code § 26150 ("Section 26150"). As the case has evolved, plaintiff's claim apparently also encompasses the denial of the Second Application on this same ground. (*See* Defendant's Motion at 2, conceding that the denial of the Second Application should be treated "as an implicitly plead claim"; Second Motion, *passim*.)[14]

The Complaint pleads a single claim, which alleges that defendant's refusal to issue a CCWP to plaintiff violates his Second Amendment right to keep and bear arms for the purpose of self

---

[14]   Plaintiff has not sought leave to amend the Complaint to expand his single claim to encompass the denial of the Second Application. However, had such leave been sought, the Court would have granted leave to file a supplemental pleading pursuant to Fed. R. Civ. P. 15(d), especially given defendant's concession that it would be "fair" to consider the denial of the Second Application as part of plaintiff's claim. Accordingly, the Court does not find the lack of a technical amendment of the pleadings to be an impediment to resolving the issues raised by the parties' respective motions with respect to the Second Application and its denial.

There is another procedural problem lurking in this case, although the parties have not raised it. The sole defendant is an entity -- the Ventura County Sheriff's Office -- and, thus, the County of Ventura is the actual defendant. There is some authority indicating that the VCSO is an improper defendant, and instead, the proper defendant here would be the Sheriff of Ventura County himself in his official capacity. *See* Scocca v. Smith, 912 F. Supp. 2d 875, 879-84 (N.D. Cal. 2012). Of course, a substitution of defendants could easily cure this possible defect, if it actually is a defect. Given its conclusion regarding the disposition of this action, however, the Court finds that resolving the proper defendant issue and/or effecting such a substitution is unnecessary.

1    defense, because plaintiff cannot exercise this right without a CCWP.  This action, however, is not

2    a direct or facial Second Amendment attack.  Plaintiff does not claim that states may not condition

3    the carrying of a concealed weapon on obtaining a permit from the appropriate state licensing

4    agency.  Plaintiff does not attack the validity of Section 26150 or its residency requirement.

5    Plaintiff has never argued in this case that requiring county residency *in itself* unduly burdens

6    Second Amendment rights or that California sheriffs are not entitled to enforce the residency

7    requirement of Section 26150.

8

9    Rather, plaintiff challenges the VCSO's *application* of the Section 26150 residency

10   requirement in his particular case.  Plaintiff's claim rests on an asserted misapplication of California

11   law by defendant, which plaintiff believes, in turn, violates the Second Amendment by precluding

12   him from being issued a CCWP and, thus, prevents him from legally carrying a concealed weapon

13   in California.  Plaintiff argues that under any definition of "resident" applicable under California law

14   -- whether Section 26150's use of the term "resident" is construed to equate to the concept of

15   "domiciliary" or something less -- he satisfies such a definition.  (Second Motion at 5 - "Whether

16   the definition is residency or domicile, Plaintiffs' [*sic*] declaration attached hereto establishes either

17   standard" and "Plaintiffs' [*sic*] primary residence and domicile is Ventura.")  As plaintiff puts it:

18   "Plaintiff contends that Defendant's definition of residency as applied to a statutory license to carry

19   a concealed weapon violates State law and therefore his rights under the Second Amendment,"

20   because "resident is defined by California law as only requiring some physical abode in the County

21   that is more than a temporary visit."  (May 28, 2013 Joint Case Management Statement and

22   Factual Stipulation at 1, 2.)

23

24   Defendant, not surprisingly, disagrees and argues that the VCSO's interpretation of the

25   term "resident," as used in Section 26150, is proper under California law and has been correctly

26   applied to plaintiff under the facts and circumstances of record.  (Defendant's Motion at 3-15.)

27   Defendant asserts that it is entitled to summary judgment for this reason alone.  In a brief

28   discussion, defendant dismisses plaintiff's Second Amendment arguments by asserting that the

1  authorities on which plaintiff relies are inapposite, because they involve the interpretation of
2  statutes that effected outright bans on firearm ownership, possession, and use, and the California
3  residency requirement at issue here is simply a reasonable limitation on the time, place, and
4  manner of carrying guns.  (Second Opposition at 14-18.)

6      Arguably, resolution of the state law question that drives this case -- *i.e.,* Is defendant's
7  interpretation and application to plaintiff of Section 26150's use of the term "resident" consistent
8  with California law or a misapplication of California law? -- should dispose of this action.  If the
9  VCSO's interpretation and application of that term with respect to plaintiff's First and Second
10 Applications comports with California law, such a finding should be the end of the matter given
11 that plaintiff plainly does not attack the validity of California's residency requirement for CCWPs
12 or California law regarding the meaning of "resident."  However, pretermitting plaintiff's cries of
13 a Second Amendment violation in such a fashion, simply because he has not directly attacked the
14 validity of California's residency requirement, would not appear to be appropriate under the
15 present decisional landscape.  At a minimum, the Ninth Circuit's pending Peruta decision
16 (discussed below) would appear to preclude eliding the Second Amendment issue in this case,
17 even if the Court were to find that no violation of California law has occurred.

19     Accordingly, the Court will first address whether the VCSO's finding -- that, for purposes
20 of Section 26150, plaintiff is not a resident of Ventura County -- comports with, or is contrary to,
21 California law, before then proceeding to the Second Amendment issue.

23     A.    The Governing CCWP Statute

25     California law generally prohibits the open or concealed carrying of firearms in public places
26 within the state subject to certain exceptions for status (such as law enforcement officers) or
27 transportation or other situations.  *See generally* California Penal Code §§ 25300-25540.
28 However, either the sheriff of a county or the chief of police of a city has the discretionary

1   authority to issue CCWPs if certain requirements are met.[15]  California Penal Code §§ 26150,

2   26155.  With some exceptions, a CCWP "conveys a right exercisable throughout the state."

3   Scocca, 912 F. Supp. 2d at 883-84; *see also* Silvester v. Harris, ___ F. Supp. 2d ___, 2014 WL

4   4209563, at *24 (E.D. Cal. Aug. 25, 2014).

5

6       Section 26150 governs CCWP applications made to county sheriffs.  The statute provides

7   that a county sheriff "may" issue a CCWP to a person upon proof of four elements:  (1) the

8   applicant is of good moral character; (2) good cause exists for the issuance of the permit; (3) the

9   applicant is a resident of the county or the applicant's principal place of employment or business

10  is within the county and the applicant spends a substantial period of time in that place of

11  employment or business; and (4) the applicant has completed a course of training as specified in

12  another statute.  As the parties agree, only the first clause of element (3) -- county residency --

13  is involved here.

14

15      Section 26150 does not contain a definition for "resident," nor is such a definition set forth

16  in Part 6 (Control of Deadly Weapons), Title 4 (Firearms), Division 5 (Carrying Firearms), and

17  _____

18      [15]   California is what is commonly referred to as a "may issue" state with respect to
    CCWPs.  Whether or not to issue a CCWP pursuant to Section 26150 rests within the discretion
19  of the local issuing authority, here, the VCSO.  By its terms, the statute makes such discretion
    explicit: "when a person applies for a [CCWP], the sheriff of a county *may* issue a license to that
20  person upon proof of all of the following. . . ." Section 26150(a) (emphasis added).  Ninth Circuit
    and California courts that have considered this "may" language in Section 12050(a) -- the
21  predecessor to Section 26150(a) -- have drawn the same conclusion, *to wit*, the statute "explicitly
    grants discretion to the issuing officer to issue or not issue a license to applicants meeting the
22  minimum statutory requirements."  Erdelyi v. O'Brien, 680 F.2d 61, 63 (9th Cir. 1982) (holding
    that applicants for a CCWP in California do not have a property interest in obtaining such permits
23  that is protected by federal due process); *see also* Gifford v. City of Los Angeles, 88 Cal. App. 4th
    801, 805 (2001) (observing that "Section 12050 gives 'extremely broad discretion' to the sheriff
24  concerning the issuance of concealed weapons licenses") (citation omitted); Nichols v. Cnty. of
    Santa Clara, 223 Cal. App. 3d 1236, 1241 (1990) ("In light of this statute's delegation of such
25  broad discretion to the sheriff, it is well established that an *applicant* for a license to carry a
    concealed firearm has no legitimate claim of entitlement to it under state law, and therefore has
26  no 'property' interest to be protected by the due process clause of the United States
    Constitution.").
27

28

1    Chapter 4 (License to Carry A Pistol, etc.) of the California Penal Code, of which Section 26150

2    is a part.  Part 6 does contain a definition for the alternate "principal place of business or

3    employment" ground, which is set forth in California Penal Code § 17020 and defines "principal

4    place of employment or business" in a manner similar to the language of Section 26150, namely,

5    by requiring that the applicant be "physically present in the jurisdiction during a substantial part

6    of the applicant's working hours for purposes of that employment or business."

7

8           B.    The History Of The Term "Resident" As Used In Section 26150

9

10          California statutes frequently use the terms "resident" and "domicile" interchangeably or

11   synonymously.  Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc., 568 F. Supp. 2d 1152,

12   1179 (C.D. Cal. 2008) ("in many statutes, 'residence' is frequently construed to mean domicile and

13   the terms are often used synonymously"; quoting Whittell v. Franchise Tax Bd., 231 Cal. App. 2d

14   278, 284 (1964), which in turn cited California Government Code §§ 243, 244, California Probate

15   Code § 301, California Civil Code § 128, and California Code of Civil Procedure §§ 395, 417), aff'd

16   by 692 F.3d 983 (9th Cir. 2012).  As this District has observed, "[t]he California Supreme Court

17   has recognized that many statutes use 'residence' and 'domicile' synonymously."  Id. (citing and

18   quoting from Smith v. Smith, 45 Cal. 2d 235, 239 (1955)).

19

20          In Smith, the California Supreme Court interpreted the term "resident" set forth in a

21   California statute governing the power to enter judgment against a California "resident" served

22   with process while in another state.  A default judgment had been entered following personal

23   service upon the defendant in New York, and he argued that the statute's use of the term

24   "resident" did not mean domicile but, rather, meant "residence in fact."  The California Supreme

25   Court noted the word "resident" was not specifically defined within the statute at issue, or by case

26   law interpreting that statute, and concluded that, in such a circumstance, its meaning must be

27   determined by the courts.  45 Cal. 2d at 239.

28

The Smith Court then observed:

> Courts and legal writers usually distinguish "domicile" and "residence," so that
> "domicile" is the one location with which for legal purposes a person is considered
> to have the most settled and permanent connection, the place where he intends to
> remain and to which, whenever he is absent, he has the intention of returning, but
> which the law may also assign to him constructively; whereas "residence" connotes
> any factual place of abode of some permanency, more than a mere temporary
> sojourn. "Domicile" normally is the more comprehensive term, in that it includes
> both the *act* of residence and an *intention* to remain; a person may have only one
> domicile at a given time, but he may have more than one physical residence
> separate from his domicile, and at the same time.

Smith, 45 Cal. 2d at 239 (*citing* two secondary sources). The California Supreme Court noted, however, that "statutes do not always make this distinction in the employment of those words" and "frequently use 'residence' and 'resident' in the legal meaning of 'domicile' and 'domiciliary,' and at other times in the meaning of factual residence or in still other shades of meaning." *Id.* The California Supreme Court then listed four California statutes in which "'residence' is used as synonymous with domicile." *Id.* at 239-40. Quoting from a state appellate court decision, the California Supreme Court concluded that "[r]esidence, as used in the law, is a most elusive and indefinite term," and its meaning in any particular statute must be determined by considering the purpose of the act. *Id.* at 240 (citation omitted). Examining the legislative history of the statute in question, the state high court determined that the term "resident," as used in the statute at issue before it, meant "domiciliary." *Id.* at 240-43.

The Court has not located, and the parties have not identified, any California decision construing the meaning of the term "resident" as used in Section 26150 and its predecessor statutes. Accordingly, as Smith instructs, the Court must look to the legislative history of Section

26150 and its predecessors to see if the purpose of the CCWP residency requirement can be ascertained.

California's first CCWP statute was enacted in 1917, and contained the present good moral character and good cause requirements but not any residency requirement. Stats. 1917, c. 145, p. 222, § 6. The statute was subsequently amended three times without including a residency requirement. *See* Stats. 1923, c. 339, p. 698, § 8; Stats. 1947, c. 1281, p. 2793, § 1; and Stats. 1951, c. 1619, p. 3660, § 1.

In 1953, the precursor to Section 26150, *i.e.*, California Penal Code § 12050 ("Section 12050"), was enacted. Stats. 1953, c. 36, p. 656, § 1. As enacted, Section 12050 did not include a residency requirement. *Id.* However, in 1969, Senate Bill 1272 passed, which amended Section 12050 to add to the the requirement that the applicant be "a resident of the county." Stats. 1969, c. 1188, p. 2318, § 1. The bill was sponsored by the Attorney General of the State of California, and it was "intended to stop 'shopping' for permits throughout the state." (*See* Enrolled Bill Memorandum to Governor for SB 1272 dated August 20, 1969, signed by the Legislative Secretary with a recommendation to "Approve."); *see also* California Bill Analysis, A.B. 2022 Sen., 8/19/1998 ("The 1969 legislation also precluded chiefs and sheriffs from issuing licenses to out-of-county residents. The 1969 limitation on the issuance of out-of-county residents may have been designed to prevent forum shopping.").

Before Senate Bill 1272 was signed by then Governor Ronald Reagan on August 30, 1969, the Attorney General and Assistant Attorney General of the State of California sent the Governor a memorandum on August 11, 1969, urging him to sign the bill into law and stating:

> The purpose of this bill is to curtail the present practice of "shopping" for concealed
> weapons permits throughout the state. It is now common practice for citizens to
> obtain these permits from law enforcement agencies in jurisdictions hundreds of

1    miles from their residence.

2

3    Senate Bill 1272 would require that an applicant obtain his permit from the sheriff

4    or a chief of police within the county of his residence.  It would also help to insure

5    that permits are not granted improvidently.  Law enforcement agencies near the

6    residence of the applicant are obviously in a much better position to evaluate the

7    background, reputation, and need for a weapon, of an applicant.

8

9    Permits to carry concealed weapons should, of course, be restricted to those who

10   are stable and have demonstrated a genuine need to carry a concealed weapon.

11   This bill will help to insure that the issuance of these permits is confined to this class

12   of persons.

13

14   Similarly, three days earlier on August 8, 1969, the District Attorney of Alameda County

15   wrote to Governor Reagan on behalf of the California Peace Officers' Association and the District

16   Attorneys' Association of California and urged the Governor to approve Senate Bill 1272, stating:

17

18        This requirement of residency will assist law enforcement in effectively

19   ascertaining just who within their county does possess such a permit, and these are

20   the officials who are most likely to know whether the applicant does in fact possess

21   that good moral character which must be demonstrated in order to obtain such a

22   license.

23

24   See also 62 Ops. Cal. Atty. Gen 509, 1979 WL 29270, at *3 (Sep. 18, 1979) (opining that the

25   residency requirement for CCWPs is "based upon the assumption that a local police agency would

26   be best equipped to determine the good moral character of the applicant, the necessity for the

27   license, and the restrictions, if any, that should be placed on it").

28

1    The addition of a residency requirement to the CCWP licensing statute, thus, was motivated

2    by a desire to ensure that CCWPs were issued only to persons who actually lived within the

3    counties in which the permits were sought.   The bill's proponents believed that an adequate

4    assessment of the good moral character and good cause requirements, as well as the need for

5    imposing any restrictions, was possible only if an applicant resided within the county of

6    application. California legislators intended that the imposition of the residency requirement would

7    deter CCWP shopping, *i.e.,* prevent applicants from applying for permits in counties which were

8    perceived to be more lenient in issuing CCWPs, rather than applying in the counties in which they

9    actually resided.   Given these legislative purposes behind the imposition of the residency

10   requirement effectuated by the passage of Senate Bill 1272, the statute's newly-added use of the

11   term "resident" appears to have been intended to embody a concept akin to that of domiciliary,

12   namely, to require that an applicant's permanent home be in the county of application.

13

14   That conclusion is buttressed by several other factors.   Section 12050 was subsequently

15   amended in 1997, when Senate Bill 146 passed and was signed into law.   Stats. 1997, c. 408, §

16   1 (S.B. 146).   Under preexisting law, a police chief could issue a CCWP to both residents of his city

17   and residents of the county at large.   The amendment effected by Senate Bill 146 took away from

18   city police chiefs the ability to issue CCWPs to persons who did not reside in their cities but who

19   resided in the county in which the city was located.   The bill's sponsor noted his intent to keep

20   "local control for issuing a [CCWP] where it belongs."   (*See* California Bill Analysis, S.B. 146

21   Assem., 7/08/1997, available on WESTLAW.)   "The impetus for the bill was to prevent a northern

22   California police chief from issuing permits to non-city residents who resided in the county." (*See*

23   California Bill Analysis, A.B, 2022 Sen., 6/30/1998, available on WESTLAW.)   Thus, California's

24   Legislature amended the CCWP statute for the purpose, once again, of ensuring that the local

25   officials who assessed CCWP applications would be appropriately postured to do so, *because the*

26   *applicants actually resided within their jurisdictions*.

27

28   Section 12050 was amended numerous times thereafter in respects not germane here.   In

2008, Section 12050 was amended to include the alternate "principal place of business or employment" language, as well as to, *inter alia*, impose a training requirement and require licensing authorities to publish and make available a written policy and give written notice regarding the action taken on an application or renewal application within specified time frames. Stats. 1998, c. 910, § 1 (A.B. 2022); 1998 Cal. Legis. Serv. Ch. 910 (A.B. 2022) (West).  This amendment expanded the category of person able to apply for CCWPs to include an alternative category, *i.e.*, those who were not domiciled within a county but who spent a substantial portion of their time working within the county.  The California Legislature again evidenced a desire that CCWPs be issued only to persons who actually were physically present within a county to a significant degree.

Significantly, California Penal Code § 26210(d) provides that, when a licensee's "place of residence" was the basis for the issuance of a CCWP, while that permit will not be automatically revoked simply because the licensee's place of residence has changed to a different county, the CCWP will expire within 90 days of the licensee's move from the county of issuance.  This statute simply continues former Section 12050(f)(4)(B) without substantive change.  Section 26210(d), thus, confirms the California Legislature's intent that a person who applies for and is issued a CCWP be tied to the county of application and issuance through the maintenance of his place of residence in that county.

Section 12050 was amended four more times after that, again in ways not germane here.  In 2010, Section 12050 was repealed and continued without substantive change, with its text split into separates statutes and renumbered, in a new Part 6 of the California Penal Code.  The portions of Section 12050 relevant here were renumbered as Section 26150.

C.    No Violation Of California Law Has Been Established.

As noted earlier, no case specifically interprets the meaning of "resident" as used in Section

26150, and the statute lacks its own definition.  The VCSO interprets "resident" to mean a person who spends most of his time and conducts most of his activities in Ventura County -- an interpretation plaintiff has stipulated he does not meet.  Plaintiff insists that the VCSO's interpretation is invalid under California law and that the VCSO was required to find that plaintiff is a "resident," because plaintiff has stated, under oath, that he is a resident and has changed his voter registration and DMV registration to Ventura County.  Plaintiff contends that defendant was required to find the residency requirement satisfied based upon plaintiff's own assertion that he *does* meet the residency requirement and that defendant was precluded from looking at other facts and circumstances and drawing a different conclusion.  Thus, as a threshold matter, the Court must determine, under the governing summary judgment standards, whether the VCSO's interpretation and application of Section 26150's "resident" requirement, as applied to plaintiff, is contrary to, or comports with, California law.

As the California Supreme Court made clear in Smith, a California statute's use of the term "resident," without definition, is ambiguous, because statutes frequently employ the terms "resident" or "residence" with the intended meaning of "domiciliary" or "domicile."  45 Cal. 2d at 239.  The California Supreme Court concluded that, given the "elusive and indefinite" nature of the term "resident" when left undefined, its meaning in any given statute requires a consideration of the purpose of the statute.  *Id.* at 240.  Thus, it was not unreasonable for the VCSO to conclude that the term "resident," as used without definition in Section 26150, was subject to interpretation and to formulate an interpretation of the term that it believed complies with California law.

California law contains a number of longstanding statutory and decisional principles that aid in this Court's interpretation of the term "resident" in Section 26150, including whether it means a status akin to "domiciliary" under California law or something lesser.  As a threshold matter, it is clear under California law that, while a California citizen may have multiple "residences," he can have only one "domicile."  Walters v. Weed, 45 Cal. 3d 1, 7-8 (1988); *see also* California Elections Code § 349.  Relatedly, every resident of California has that one domicile,

1  and it is "not lost until a new one is acquired." *Id.* (collecting cases).  California Government Code

2  §§ 243 and 244 set forth California's "basic rules" regarding residence and domicile.  These

3  statutes are part of the portion of the California Government Code related to the "Sovereignty of

4  the State" (Chapter 1) and its "Rights Over Persons" (Article 5).  Section 243 states that, in law,

5  every person has a "residence."  Section 244 defines "residence" to mean, in effect, domicile, *to*

6  *wit,* it is the "place where one remains when not called elsewhere for" work or other "special or

7  temporary purpose," and there "can only be one residence," which "cannot be lost until another

8  is gained."

9

10  California law recognizes that intent plays a role in determining whether a location

11  constitutes a person's primary residence, or domicile, but that "[i]ntent alone is insufficient."  In

12  re Marriage of Thornton, 135 Cal. App. 3d 500, 509 (1982).  "'[A] residence can be gained or lost

13  only by the union of act and intent, but as the act alone is insufficient, so the intent alone is

14  insufficient.'"  Aldabe v. Aldabe, 209 Cal. App. 2d 453, 466 (1962) (citation omitted).  "To

15  establish a domicile the union of act and intent is necessary." *Id.*  The intent needed to be shown

16  must be "'an intention as to the fact, not as to the legal consequences of the fact,'" for "'[a] man's

17  home is where he makes it, not where he would like to have it.'" *Id.* (citation omitted).  A

18  declaration of intent by someone as to which place is his residence or domicile is ineffective "until

19  the intention is carried into effect by the completed act."  Sheehan v. Scott, 145 Cal. 684, 690

20  (1905), *overruled on other grounds by* Zeilenga v. Nelson, 4 Cal. 3d 716 (1971).  Thus, a desire

21  to make one location a permanent home in the future is not enough to establish that site as one's

22  domicile or permanent residence. *Id.* ("'A change in the domicile of a person cannot be effected

23  by an intention in the mind to make this change, unless it is accompanied by an actual change in

24  the place of abode.'") (citation omitted); *see also* Aldabe, 135 Cal. App. 3d at 509.

25

26  California law also provides guidance on the situation, as here, when a person has more

27  than one California residence.  "The mere intention to acquire a new domicile, without the fact

28  of removal, avails nothing, neither does the fact of removal, without the intention."  California

1   Elections Code § 2024.  "In order to effect a change of residence, there must be a concurrence

2   in the act of abandonment of one residence with the intent to establish a new residence

3   elsewhere," and the individual's intent can be established by testimony from the relevant parties

4   "considered in connection with the surrounding circumstances, plus corroboration when essential."

5   Ericksen v. Ericksen, 57 Cal. App. 2d 532, 535-36 (1943).[16]

6

7        [A] person can have but one bona fide residence.  Residence depends upon

8        intention as well as fact; and in its ordinary acceptation it is the place where one

9        remains when not called elsewhere on business, pleasure or for other temporary

10       purpose.  The mere inhabitancy of a summer home or country house at certain

11       seasons of the year or at certain times would not make the party inhabiting said

12       house a resident of the county in which such house is situated.

13

14   Younger v. Spreckels, 12 Cal. App. 175, 177 (1909).  As one California District Court construing

15   California law on the question of the meanings of "residence" and "domicile" found:

16

17       A mere change of place of abode, however long continued, is insufficient, unless the

18       proper animus or intention is present.  This [is], because, as stated by Mr. Justice

19       Stone in *State of Texas v. State of Florida*:  "Residence in fact, coupled with the

20       purpose to make the place of residence one's home, are the essential elements of

21       domicile."

22

23            For this reason, "the place where a man lives is properly taken to be his

24       domicile until facts adduced establish the contrary."  And, while to establish such

25       intent, the acts and declarations of a person may be considered, a mere "floating

26

27           [16]   Ericksen, thus, renders meritless plaintiff's complaint that the VCSO was required
28   to accept plaintiff's representations at face value and was precluded from conducting any
     investigation into the residency issue.

1    intention to return at some future period["] to a former place of abode is not

2    enough to overcome residence in fact, — especially if it has continued for a long

3    period of time

4

5    Penn. Mut. Life Ins. Co. v. Fields, 81 F. Supp. 54, 57-58 (S.D. Cal. 1984) (footnotes and citations

6    omitted).

7

8    As the Supreme Court made clear in the decision noted above:

9

10        Residence in fact, coupled with the purpose to make the place of residence

11        one's home, are the essential elements of domicile. . . .  While one's statements

12        may supply evidence of the intention requisite to establish domicile at a given place

13        of residence, they cannot supply the fact of residence there; . . . and they are of

14        slight weight when they conflict with the fact. . . .   This is the more so where, as

15        here, decedent's declarations are shown to have been inspired by the desire to

16        establish a nominal residence for tax purposes, different from his actual residence

17        in fact. . . .  In such circumstances the actual fact as to the place of residence and

18        decedent's real attitude and intention with respect to it as disclosed by his entire

19        course of conduct are the controlling factors in ascertaining his domicile.

20

21    State of Texas v. State of Florida, 306 U.S. 398, 424-45 (1939) (citations omitted).  In that case,

22    several states in which the decedent had lived at varying times made competing tax claims against

23    the decedent's estate.  The Supreme Court concluded that Massachusetts -- where the decedent

24    maintained and renovated a family home and where his wife lived -- was the decedent's domicile,

25    rather than Texas, which the decedent repeatedly had declared to be his place of legal residence,

26    or Florida, where, for health reasons and for the several years before his death, the decedent had

27    spent about four and a half months each winter in a home he renovated.  Id. at 416-27.  The

28    Supreme Court disregarded the decedent's repeated oral and written statements (including in

numerous legal documents) of his intent that Texas remain his place of domicile, because, *inter alia*, he never paid taxes there, his significant personal property was in Massachusetts, and his family life (including his wife) was in Massachusetts. "He could not elect to make his home in one place in point of interest and attachment and for the general purposes of life, and in another, where he in fact had no residence, for the purpose of taxation." *Id.* at 426. The Supreme Court also found that there was no proof that the decedent's domicile in Massachusetts was abandoned for his Florida home. The State of Florida's "burden is not sustained by showing a period of winter residence there in obedience to the demands of health, in the absence there of the activities associated with decedent's chief interests and of the objects of those interests and of intimate family association, with which he had surrounded himself at" his Massachusetts home. *Id.* at 427.

With these principles in mind, the Court also notes, as <u>Smith</u> establishes, the long history of California courts interpreting the term "resident" in California statutes to mean, in effect, "domiciliary." *See* <u>Burt v. Scarborough</u>, 56 Cal. 2d 817, 820-21 (1961) (noting the historical practice of California courts construing the term "reside" to mean "domicile"); *see also* <u>Penn. Mut. Life Ins. Co.</u>, 81 F. Supp. at 57 ("as a rule, whenever 'residence' is mentioned [in California statutes], it is evident that a residence which has risen to the dignity of 'domicile' is meant"). As noted in <u>Smith</u>, 45 Cal. 2d at 239, California Government Code §§ 243 and 244 set forth California's "basic rules" regarding domicile, and Section 244 defines "residence" as meaning the equivalent of domicile. Given these broad statutory provisions, as the Southern District of California found in <u>Penn Mut. Life Ins. Co.</u>, *supra*, the California statutory scheme generally contemplates that a "resident" is a "domiciliary," absent an indication otherwise. *See* <u>Fenton v. Bd. of Dirs. of the Groveland Cmty. Servs. Dist.</u>, 156 Cal. App. 3d 1107, 1113-15 (1984) (affirming trial court's interpretation of the term "residing" used in California Government Code § 61200 to mean "domiciled," relying on both <u>Smith</u> and the "basic rules" set forth in Government Code § 244).

In interpreting a statute where the language is clear, courts must follow its plain

meaning. . . .  However, if the statutory language permits more than one reasonable interpretation, courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute. . . .  In the end, we must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences. . . .

In re Marriage of Amezquita & Archuleta, 101 Cal. App. 4th 1415, 1419 (2002) (citation and internal punctuation omitted) (interpreting "residence" as used in California Family Code § 4962 to mean "domicile").

Following this admonition, and as it did in connection with the First Motion and the First SJ Order, the Court has considered the legislative history pertinent to Section 26150's use of the term "resident" in conjunction with the above-noted statutory and decisional law.  The legislative history of the imposition of a residency requirement for CCWP applicants evidences an intent that county sheriffs grant CCWPs based on the residency prong only to those persons who actually reside within their counties.  Plaintiff's contention that the Section 26150 residency requirements means nothing more, under California law, than "only requiring some physical abode in the County that is more than a temporary visit" (May 28, 2013 Joint Case Management Statement and Factual Stipulation at 2) is wholly unpersuasive given the California decisions discussed above and the legislative purpose behind the imposition of the residency requirement for CCWP applications.  Equally unpersuasive is plaintiff's contention that the VCSO was required to defer to plaintiff's statements and was precluded from conducting an investigation into the facts.  As noted above, that assertion is contrary to California law, which requires:  proof of *both* intent and action, because intent alone is insufficient; and proof not only of the applicant's stated intent but *also* obtaining corroboration of such asserted intent when necessary *and* a consideration of the of the surrounding facts and circumstances. *See, e.g.,* Aldabe, 209 Cal. App. 2d at 466; Ericksen, 57 Cal.

1    App. 2d at 535-56.  Indeed, as the Supreme Court has made clear, a declaration of intent with
2    respect to domicile and/or permanent residence -- no matter how vehemently or repeatedly made
3    -- will not control when the facts and circumstances show otherwise.  State of Texas, 306 U.S. at
4    424-27.

5

6         The VCSO interprets residence for Section 26150 purposes to mean the county in which
7    a person spends most of his or her time and conducts most of his or her activities.  That
8    interpretation is consistent with the foregoing California case law and the legislative history behind
9    Section 26150's residency requirement.  Accordingly, the Court finds that the definition of resident
10   which the VCSO applied to plaintiff does not violate California law.

11

12        The next question then is whether, under summary judgment standards, there is an
13   absence of a triable issue of material fact on the question of whether defendant erred in finding
14   that plaintiff does not meet the residency requirement as it has been defined by the VCSO.  The
15   Court finds that there is no triable issue of material fact on this critical question, for several
16   reasons, any one of which would be dispositive.

17

18        First, and critically, plaintiff has stipulated that he does *not* meet the VCSO's definition of
19   resident.  That stipulation became a part of this Court's Order of May 31, 2013, and is the law of
20   this case.  Moreover, that same stipulation was relied upon and made a finding in the Court's First
21   SJ Order.  Plaintiff has never challenged either of the Court's Orders or sought to retract his
22   stipulation.  Thus, it binds him.

23

24        Second, even absent plaintiff's stipulation, the VCSO's conclusion that its investigation
25   confirmed that plaintiff does not meet the VCSO's definition of resident is amply supported by
26   uncontroverted evidence.  The only evidence that plaintiff is a resident of Ventura County is that
27   he:  owns a one-bedroom condominium there (along with homes in two other Southern California
28   counties); changed his voter registration to Ventura County after he submitted the First

Application listing the Oxnard Home as his residence, *i.e.,* on the day he was interviewed by Gonzales, almost seven months after he purchased the Oxnard Home; apparently registered the Oxnard Home with the DMV as his residence on the same date he changed his voter registration.[17] Further, plaintiff's statements regarding his permanent home(s) have been significantly inconsistent, *to wit,* he earlier stated that he splits his times between his three homes, considers the Oxnard home to be "one of [his] permanent homes," and cannot designate any one County as the place in which he spends the majority of his time (First Plaintiff Decl. ¶¶ 4-6), but more recently has stated that the Oxnard Home is his "primary," "permanent home" and "domicile" (Second Plaintiff ¶¶ 1-2, 4). While the Court makes no credibility finding with respect to Plaintiff's First and Second Declarations, it notes that they are bereft of detail and, for the most part, actual facts.[18]

---

[17]   Plaintiff alleges this in his Second Declaration and his counsel has asserted this at hearings and in plaintiff's Opposition to Defendant's Motion.   Other than plaintiff's Second Declaration, however, no proof of such DMV registration has been adduced. As noted earlier, his driver's license lists his Burbank work address.

[18]   While the Court does not rely on the following in ruling on the pending Motions, it is interesting to note that, although plaintiff stated on May 12, 2014, under penalty of perjury, that the Oxnard Home is his primary and "permanent" home to which he plans on returning when absent and where he intends to remain, an Internet search reveals that a property at the same address as the Oxnard Home, , *i.e.,* 3101 Peninsula Road, Unit 205, Oxnard, California 93035 (*see* First Gonzales Decl. Ex. I, plaintiff's CCWP application listing this address), has been placed on the market for sale.  For example, Coldwell Banker, a real estate company, contains a sales listing for property at the same address as the Oxnard Home, which is viewable at: http://www.californiamoves.com/property/details/3901870/MLS-214029183/3101-Peninsula-Road-205-Oxnard-CA-93035.aspx <viewed September 23 and 30, 2014>.  That listing states that it was originally received on July 31, 2014, and (when originally viewed by the Court on September 23, 2014) an open house was scheduled for September 28, 2014.  Numerous other well-known real estate websites -- such as, *inter alia,* zillow.com, redfin.com, and trulia.com <viewed on September 23 and 30, 2014> among numerous other sites -- show the Oxnard Home as listed for sale and (when originally viewed by the Court) with a scheduled open house.

That plaintiff placed the Oxnard Home on the market so closely after he submitted his May 2014 declaration tends to belie his assertions regarding the *permanent* nature of the Oxnard Home as his domicile and his alleged intent at all times to return to, and remain at, the Oxnard Home.  And while the Court has not considered the unsupported factual assertions made by plaintiff's counsel as evidence in this case, the listing of the Oxnard Home for sale in July 2014 is consistent with counsel's representation that plaintiff's son, having graduated from college, no

1   In contrast, there is uncontroverted evidence that, when the VCSO visited the Oxnard

2   Home on four occasions in April and May 2014, there was no sign of any car belonging to plaintiff

3   or his wife.  In repeated visits by the VCSO to plaintiff's Santa Clarita home in January and

4   February 2013, April 2014, and May 2014, plaintiff was observed leaving the Santa Clarita home

5   in the morning hours and/or returning to that home, and both his and his wife's cars were

6   observed at that home.  Until approximately one week ago, plaintiff listed Santa Clarita as his

7   location on his Twitter page.  His wife lives at the Santa Clarita home.[19]  The cars belonging to

8   plaintiff and his wife are registered to the Santa Clarita home address and his Burbank work

9   address, not the Oxnard Home address.  The business at which both plaintiff and his wife work

10  is located in Los Angeles County, not Ventura County.  Plaintiff listed his Burbank work address

11  as his mailing address on the First Application, not the Oxnard Home address.  Finally, although

12  plaintiff purchased the Oxnard Home in June 2012, he did not change his voter/DMV registration

13  until February 2013, a month after he had submitted the First Application and on the day he was

14  interviewed by Gonzales.  There is no evidence that plaintiff has voted in Ventura County.

15

16  In short, there is no evidence of any connection between plaintiff and Ventura County other

17  than the facts that he purchased a one-bedroom condominium in Oxnard in June 2012, which he

18  shared on occasion with his son who lived there on a full-time basis, and belatedly registered to

19  vote there after he sought a CCWP.  Even crediting plaintiff's declarations with respect to the

20  "intent" aspect of "residence" and "domicile" under California law, the evidence of the requisite

21  "union" of "intent" and "act" is missing.  Rather, the evidence of the required "act" shows only a

22

23  _____

24  longer lives in the Oxnard Home, as well as with the property manager's advice to Gonzales that
    she understood plaintiff and his wife to be renting the Oxnard Home to his son.

25      [19]   Plaintiff does not suggest that he and he and his wife are estranged; indeed, in his

26  interview with Gonzales, plaintiff's statements as a whole indicate that he and his wife spend
    substantial time together.  Thus, it is odd that plaintiff's alleged permanent home is in Oxnard (a

27  one-bedroom condominium shared (at least in the past) with his adult son), and his wife's home
    is in Santa Clarita -- almost 50 driving miles from Oxnard, (which, given Southern California traffic,

28  is a significant distance).

connection with Los Angeles County and plaintiff's home in Santa Clarita.  As plaintiff has stipulated, he neither spends nor conducts the majority of his activities in Ventura County.  There was significant and substantial evidence available to the VCSO showing that the everyday incidents of plaintiff's life are in Los Angeles County, the place listed on his California driver's license, which is where he maintains a home with his wife and his wife resides, he was residing (rather than Oxnard) on every occasion that the VCSO had conducted surveillance, his business is located, and his cars are registered.[20]  The evidence of record does not support the finding, as required under California law, that plaintiff has abandoned his Santa Clarita home as his domicile and replaced it with the Oxnard Home as his domicile.  The  evidence amply supports the conclusion that plaintiff remains a "resident" of Los Angeles County within the meaning of Section 26150 and is not a "resident" of Ventura County within the meaning of that statute.[21]

Plaintiff has not met his burden of establishing that there is no question of material fact on

---

[20]      Whether there are, as plaintiff's counsel suggests in his briefing, additional facts that might explain some of these circumstances is of no moment.  This is the second round of summary judgment motions in this case.  Plaintiff failed to prevail on his prior motion, and the Court, in its First SJ Order, explicitly advised plaintiff that unsupported assertions by his counsel do not constitute evidence for Rule 56 purposes.  In this current round of briefing in connection with the pending Motions, plaintiff failed, as required by Local Rule 56-2, to respond to, or otherwise controvert, defendant's Local Rule 56-1 Statement of Uncontroverted Facts, and when the Court effectively gave plaintiff an opportunity to remedy this noncompliance (and warned him of the consequences of not doing so) through its Order of July 23, 2014, plaintiff expressly advised the Court Clerk that he did not intend to comply with Local Rule 56-2.  Plaintiff, therefore, cannot complain that the facts on which the Court must base its ruling are anything *other* than as established by the evidence actually before the Court and of record.

[21]      Plaintiff's characterization of the VCSO's finding that he is not a resident of Ventura County as an "abuse of discretion" is a red herring.  The issue in this case has always been whether the VCSO's interpretation of the term "resident," as used in Section 26150, and its finding that plaintiff does not meet that definition comport with California law and whether the consequent denial of a CCWP to plaintiff on that basis violates the Second Amendment.  To the extent that plaintiff, by a brief, ten-line discussion at the end of his Second Motion now purports to mount a new broad facial challenge to the discretionary "may" language of Section 26150 (see Note 15, *supra*), this new claim constitutes an entirely different and direct attack on the validity of Section 26150 that plaintiff has not previously raised in this case.  The Court declines to consider any such belated, and wildly expanded, claim.

1  the issue of whether he is a "resident" of Ventura County within the meaning of Section 26150,

2  and thus, defendant erred in concluding otherwise.  He simply has failed to produce the required

3  "significant probative evidence tending to support" his claim of residency.  Bias, 508 F.3d at 1218.

4  Defendant has met its burden of establishing that there is no triable issue of material fact on this

5  question, as no reasonable jury viewing the record before the Court would find, by a

6  preponderance of the evidence, that plaintiff is a "resident" of Ventura County within the meaning

7  of Section 26150.  Pyramid Technologies, 752 F.3d at 818.  Because the record, taken as a whole,

8  could not lead a rational factfinder to find for plaintiff on this issue, there is no genuine issue for

9  trial, and defendant is entitled to summary judgment on the issue of whether the VCSO's finding

10  that plaintiff was not a Ventura County "resident," and its consequent denial of his First and

11  Second Applications, was appropriate under California law.  Matsushita, 475 U.S. at 587.

12

13        D.     The Second Amendment Issue

14

15        The question now is whether defendant's application of California's residency requirement,

16  even though proper under California law, nonetheless violates the Second Amendment.

17

18              1.     The Evolving Second Amendment Jurisprudence

19

20        The Second Amendment states:  "A well regulated Militia, being necessary to the security

21  of a free state, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const.

22  amend. II.  In Robertson v. Baldwin, 165 U.S. 275, 281-82 (1987), the Supreme Court observed

23  that many of the freedoms guaranteed by the Bill of Rights are subject to "certain well-recognized

24  exceptions" and, in listing such exceptions, observed that "the right of the people to keep and

25  bear arms is not infringed by laws prohibiting the carrying of concealed weapons."  The Supreme

26  Court has never retracted that pronouncement nor questioned it.  Nonetheless, in recent years,

27  there has been an explosion of cases brought challenging state and local municipality laws and

28  regulations restricting the carrying of concealed weapons.  These lawsuits, without question, are

1   the result of two Supreme Court decisions -- District of Columbia v. Heller, 554 U.S. 570 (2008),

2   and McDonald v. City of Chicago, 561 U.S. 742 (2010).

3

4        In Heller, the Supreme Court considered a District of Columbia law that banned the

5   possession of handguns in the home and required that any lawful firearm be kept in an inoperable

6   condition.  The Supreme Court found that the right embodied in the Second Amendment is an

7   individual right to "keep and carry arms," and that "the inherent right of self-defense has been

8   central to the Second Amendment right."  554 U.S. at 627-28.  The Supreme Court opined that

9   the core protection of this Second Amendment right is "the right of law-abiding, responsible

10  citizens to use arms in defense of hearth and home" and found that the District of Columbia's

11  absolute prohibition on the possession of handguns in the home, as well as its requirement that

12  firearms be rendered inoperable, violated the Second Amendment.  *Id.* at 635.  The Supreme

13  Court concluded that, because the District of Columbia law effected a total ban and rendered it

14  impossible for citizens to use firearms "for the core lawful purpose of self-defense" of the home,

15  the law would fail under any standard of scrutiny applicable, but the high court declined to specify

16  what standard of scrutiny should be used in connection with Second Amendment challenges other

17  than to indicate that rational basis review is not appropriate.  *Id.* at 628-29 & n.27, 630.  In

18  McDonald, the Supreme Court held that the Second Amendment right found in Heller extends to

19  state citizens.  McDonald, 130 S. Ct. 3020, 3026.

20

21       Heller did not resolve the constitutionality of statutes and regulations that "are less

22  restrictive that the near-total ban at issue in that case."  Jackson v. City and County of San

23  Francisco, 746 F.3d 935, 359 (9th Cir. 2014).  The Supreme Court has yet to address the

24  relationship between the Second Amendment right found in Heller and statutes and regulations

25  that govern carrying firearms outside the home, whether on an open or a concealed basis.

26  However, in Heller, the Supreme Court made clear that regulating handgun use is permissible,

27  "the right secured by the Second Amendment is not unlimited," and "the right was not a right to

28  keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."

1   Heller, 554 U.S. at 626.  The Supreme Court explained that:

3        For example, the majority of the 19th-century courts to consider the question held
4        that prohibitions on carrying concealed weapons were lawful under the Second
5        Amendment or state analogues. . . .  Although we do not undertake an exhaustive
6        historical analysis today of the full scope of the Second Amendment, nothing in our
7        opinion should be taken to cast doubt on longstanding prohibitions on the
8        possession of firearms by felons and the mentally ill, or laws forbidding the carrying
9        of firearms in sensitive places such as schools or government buildings, or laws
10       imposing conditions and qualifications on the commercial sales of arms.

12   Id. at 626-27 (internal citations omitted).  Such prohibitions, although not an "exhaustive" list, are
13   "presumptively lawful regulatory measures."  Id. & n. 26.

15       Although Heller did not decide the procedural framework and scrutiny level applicable to
16   Second Amendment challenges, the "majority of" Circuit Courts "have discerned from Heller's
17   approach a two-step Second Amendment inquiry."  Jackson, 746 F.3d at 960.  "The two-step
18   inquiry we have adopted '(1) asks whether the challenged law burdens conduct protected by the
19   Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny.'"  Id.
20   (quoting United States v. Chovan, 735 F.3d 1127, 1136 (9th Cir. 2013), pet. for cert. filed (June
21   26, 2014) (U.S. No. 14-5032)).

23       The first step of this inquiry requires courts to decide whether the challenged law burdens
24   conduct protected by the Second Amendment based upon a historical understanding of the scope
25   of the Second Amendment right, or whether the challenged law falls within a well-defined and
26   narrowly-limited category of prohibitions that have been historically unprotected.  Jackson, 746
27   F.3d at 960.

1
2
3
4
5
6

> To determine whether a challenged law falls outside the historical scope of the Second Amendment, we ask whether the regulation is one of the "presumptively lawful regulatory measures" identified in *Heller*, 554 U.S. at 627 n.26, 128 S. Ct. 2738, or whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment.

7
8     *Id.*
9

10    If a court determines that the law or regulation burdens conduct that falls within the
11    historical scope of the Second Amendment, the second step of the inquiry requires a court to
12    determine the appropriate level of scrutiny to be applied. Jackson, 746 F.3d at 960; Chovan, 735
13    F.3d at 1136.   Rational basis review is not appropriate; rather, a court must apply either
14    intermediate or strict scrutiny. Heller, 554 U.S. at 628 n.27; Jackson, 746 at 961; Chovan, 735
15    F.3d at 1137-38. To determine the appropriate level of scrutiny, a court must consider "(1) 'how
16    close the law comes to the core of the Second Amendment right' and (2) 'the severity of the law's
17    burden on the right.'" Chovan, 735 at 1138 (citation omitted).  With respect to prong (1), courts
18    must bear in mind Heller's holding that the Second Amendment core purpose is the individual'
19    citizen's right to use arms in defense of hearth and home. Jackson, 746 F.3d at 961; Chovan, 735
20    F.3d at 1138. With respect to prong (2), as in First Amendment analysis, laws that regulate only
21    the *manner* in which a person may exercise his Second Amendment rights are less burdensome
22    than those, such as in Heller, that bar firearm possession completely. Jackson, 746 F.3d at 961.
23    "[F]irearm regulations which leave open alternative channels for self-defense are less likely to
24    place a severe burden on the Second Amendment right than those which do not." *Id.* If a
25    challenged law does not place a substantial burden on the Second Amendment right, intermediate
26    scrutiny applies. *Id.* Intermediate scrutiny requires "(1) the government's stated objective to be
27    significant, substantial, or important; and (2) a reasonable fit between the challenged regulation
28    and the asserted objective." Chovan, 735 F.3d at 1139.

2.    Step One: Does California's County Residence Requirement For The Issuance Of CCWPs Burden Conduct Protected By The Second Amendment?

Prior to February 13, 2014, resolving the first step of the Chovan two-step test would have been a difficult task, as the decisional law on this issue was conflicting. *Compare, e.g.,* Drake v. Filko, 724 F.3d 426, 429 (3d Cir. 2013) ("we conclude that the requirement that applicants demonstrate a 'justifiable need' to publicly carry a handgun for self-defense qualifies as a 'presumptively lawful,' 'longstanding' regulation and therefore does not burden conduct within the scope of the Second Amendment's guarantee"), *cert. denied* 134 S. Ct. 2134 (2014), and Peterson v. Martinez, 707 F.3d 1197, 1209-12 (10th Cir. 2012) (holding that the concealed carrying of firearms falls outside the scope of the Second Amendment guarantee), *with* Moore v. Madigan, 702 F.3d 933, 942 (7th Cir. 2012) ("The Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside."). Rather than resolving the first step inquiry, some Circuits simply have assumed, *arguendo*, that the first step is satisfied, proceeded to the second step, and apply the intermediate scrutiny standard of review. *See, e.g.,* Woollard v. Gallagher, 712 F.3d 865, 875-76 (4th Cir. 2013), *cert. denied* 134 S. Ct. 422 (2013); Kachalsky v. County of Westchester, 701 F.3d 81, 93 (2d Cir. 2012), *cert. denied* 133 S. Ct. 1806 (2013).

On February 13, 2014, a sharply divided panel of the Ninth Circuit issued its decision in Peruta v. County of San Diego, 742 F.3d 1144, 1166, 1172 (9th Cir. 2014), finding that the Second Amendment "right to bear arms includes the right to carry an operable firearm outside the home for the lawful purpose of self-defense" and "require[s] that the states permit *some form* of carry for self-defense outside the home." The majority in Peruta found that, because the State of California generally bars the open carrying of weapons outside the home but permits concealed carrying of weapons if a permit is granted (which requires a finding of "good cause"), the County of San Diego's policy at issue -- which provided that concern for one's safety alone does not

1  constitute the requisite "good cause" -- "destroys" the Second Amendment right to bear arms, and

2  thus, is unconstitutional.  *Id.* at 1168-70.  The Peruta majority concluded that the "good cause"

3  requirement of California's CCWP system, as that "good cause" requirement was being interpreted

4  and applied by the County of San Diego, required "per se invalidation," because it was the type

5  of "rare law that 'destroys' the" Second Amendment right.  *Id.* at 1170.  While the Peruta majority

6  opinion noted the Chovan two-step test, it specifically elected not to apply the second part of that

7  test based on its conclusion that the law at issue required "per se invalidation" and, thus,

8  heightened scrutiny review was inappropriate.  742 F.3d at 1168, 1175-78.

9

10  The Peruta decision is not final.  Motions to intervene as well as petitions for rehearing and

11  review *en banc* are pending, and thus, the mandate has not issued and is stayed.  Given the

12  existing intra-Circuit conflict with respect to the subject-matter of the Peruta decision, it seems

13  possible, if not likely, that the Supreme Court will grant *certiorari* in one of the CCWP cases,

14  although it has declined to do so to date.  At this time, however, the majority opinion in Peruta

15  constitutes Ninth Circuit law that this Court must follow.  *See* Miller v. Gammie, 335 F.3d 889,

16  899-900 (9th Cir. 2003) (*en banc*) (noting that lower courts are bound by the holdings of higher

17  courts); Hart v. Massanari, 266 F.3d 1155, 1170-71 (9th Cir. 2001) (opining that "the first panel

18  to consider an issue sets the law not only for all the inferior courts in the circuit, but also future

19  panels of the court of appeals"; "[b]inding authority must be followed unless and until overruled

20  by a body competent to do so"; and "[o]nce a panel resolves an issue in a precedential opinion,

21  the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the

22  Supreme Court); *see also* Nichols v. Harris, ___ F. Supp. 2d ___, 2014 WL 1716135, at *1 (C.D.

23  Cal. May 1, 2014) (finding that Peruta is binding on district courts notwithstanding its presently

24  unsettled procedural posture).

25

26  In addressing the Second Amendment issue, the Court will follow the "cautionary" approach

27  the First Circuit has suggested is appropriate and will "not engage in answering the question of

28  how *Heller* applies to possession of firearms outside the home," given that "the whole matter is

1    a 'vast *terra incognita* that courts should enter only upon necessity and only then by small

2    degree.'" Hightower v. City of Boston, 693 F.3d 61, 75 (1st Cir. 2012) (citation omitted).  In view

3    of the panel majority opinion in Peruta and its broad interpretation of the Second Amendment

4    right found in Heller, the Court will assume, as other courts have done, that the first step of the

5    Chovan test is satisfied with respect to Section 26150's residency requirement and will proceed

6    to the second step.

7

8            3.       Step Two:  Does California's Residency Requirement For The Issuance

9                     of CCWPs Survive The Appropriate Standard Of Scrutiny?

10

11           Heller left open the question of the particular level of scrutiny that should be used in a

12   given Second Amendment case other than to rule out rational basis review, 554 U.S. at 628 n.27,

13   and as the second part of the Chovan test makes clear, a court hearing such a challenge must

14   determine which scrutiny standard should be applied, 735 F.3d at 1136.  To make that

15   determination, a court must consider (1) how close the law comes to the core of the Second

16   Amendment right and (2) the severity of the law's burden on that right.  Chovan, 735 F.3d at

17   1138.  With respect to (1), a court looks to the core of the Second Amendment right enunciated

18   in Heller, *i.e.,* the right of law abiding citizens to use arms in defense of hearth and home.

19   Jackson, 746 F.3d at 961; Chovan, 725 F.3d at 1138.  With respect to (2), "laws which regulate

20   only the '*manner* in which persons may exercise their Second Amendment rights' are less

21   burdensome that those which bar firearm possession completely."  Jackson, 746 F.3d at 961

22   (*quoting* Chovan, 735 F.3d at 1138).  "[F]irearm regulations which leave open alternative channels

23   for self-defense are less likely to place a severe burden on the Second Amendment right than

24   those which do not."  Jackson, 746 F.3d at 961.

25

26           If a challenged law or regulation does not implicate a core Second Amendment right, or

27   does not place a substantial burden on the Second Amendment, intermediate scrutiny is

28   appropriate at the second step of the Chovan test.  Jackson, 746 F.3d at 961.  Plaintiff appears

1  to concede that intermediate scrutiny is the appropriate standard of review here (Second Motion
2  at 4), and the Court agrees.  This is not an instance, as in <u>Heller</u> or as found by the Ninth Circuit
3  in <u>Peruta</u>, in which the application of the challenged state law effects a *de facto* destruction of the
4  Second Amendment right to bear arms for self defense, and thus, intermediate scrutiny would be
5  precluded.  California provides for the issuance of CCWPs but simply has decided that an applicant
6  for a CCWP must seek his permit from the county in which he actually resides.  As noted above,
7  under California law, every California citizen has a domicile, and thus, every California citizen who
8  desires a CCWP has a county in which he may submit his application.  At most, the Section 26150
9  residency requirement regulates the *manner* in which those desiring to carry concealed weapons
10 for self defense may exercise their right to do so, *i.e.,* by making their applications in the
11 appropriate county of residence rather than shopping for a county among counties perceived to
12 be more lenient with respect to granting CCWPs.

14     In addition, for the most part, those federal courts that have considered challenges to laws
15 and regulations found to affect (rather than destroy) the manner in which Second Amendment
16 rights are exercised have, at the second step, applied intermediate scrutiny.  *See, e.g.,* <u>Jackson</u>,
17 746 F.3d at 965 (San Francisco ordinances that regulated handgun storage and ammunition sales
18 were assessed, and found constitutional, under intermediate scrutiny review); <u>Drake</u>, 724 F.3d
19 at 436-40 (applying intermediate scrutiny to a New Jersey law that required applicants for CCWPs
20 to show "justifiable need" to publically carry a handgun for self defense, and finding that
21 requirement to withstand intermediate scrutiny); <u>Woollard</u>, 712 F.3d at 876-82 (applying
22 intermediate scrutiny to the good-and-substantial-reasons requirement of Maryland's CCWP law
23 and holding that the requirement is constitutional); <u>Peterson</u>, 707 F.3d at 1216 (although the
24 majority did not reach the second step, the concurring opinion found that intermediate scrutiny
25 should be applied, and was satisfied, with respect to a Colorado statute that limited issuance of
26 CCWPs to state residents); <u>Kachalsky</u>, 701 F.3d at 93-101 (reviewing, and finding constitutional,
27 under intermediate scrutiny the "proper cause" requirement of New York's CCWP scheme).

28

1    Applying intermediate scrutiny here to the residency requirement at issue, the Court must

2  consider whether (1) the government's stated objective is significant, substantial, or important,

3  and (2) there is a reasonable fit between the challenged law and the asserted objective. Chovan,

4  735 F.3d at 1139.

5

6    The first factor is satisfied readily here. As described earlier, Section 26150's residency

7  requirement was imposed to curtail the practice of persons "shopping" for CCWPs in counties

8  where they did not reside. The sponsors and supporters of the implementing bill believed that

9  limiting the grant of CCWPs to counties in which applicants actually resided would "insure that

10 permits are not granted improvidently," because local law enforcement officials would be

11 "obviously in a much better position to evaluate the background, reputation, and need for a

12 weapon, of an applicant," and this would help to "insure" that the issuance of CCWPs would be

13 limited to persons who met the statutory requirements, including good moral character. In a state

14 as large as California and with such differing population dynamics and geography, it is readily

15 apparent that individual needs for carrying concealed weapons may differ tremendously between

16 citizens of one county versus another county, just as the discretion to be exercised by county

17 sheriffs in issuing CCWPs may need to be exercised in different manners between different

18 counties. In short, it makes sense that California would wish to vest decisionmaking authority at

19 the local, county level and to make such local decisionmaking meaningful by requiring county

20 residence as a condition for obtaining a CCWP.

21

22    In addition, the State of California's interest in public safety is self-evident. See, e.g.,

23 United States v. Salerno, 481 U.S. 739, 748-50 (1987) (discussing the government's "legitimate

24 and compelling interest" in public safety and preventing crime and stating: "We have repeatedly

25 held that the Government's regulatory interest in community safety can, in appropriate

26 circumstances, outweigh an individual's liberty interest."). In the State of California's motion to

27 intervene filed in the Peruta appeal, California expressly noted its significant interest "in preserving

28 and protecting public safety through the reasonable regulation of public carrying" of firearms.

1  (*See* Case No. 10, 56971, Docket No. 122-1 at 14.)

2

3         With respect to the second factor -- which addresses whether there is a reasonable fit

4  between the residence requirement and the State of California's interest -- the Court also finds

5  that factor satisfied.  Ensuring that CCWP holders are qualified under California law furthers the

6  state's objective of fostering public safety, and the residency requirement is a reasonable means

7  of ensuring that decisionmakers have a basis for making such qualification decisions.  Requiring

8  the assessment of CCWP applications at the local county level maximizes the likelihood that

9  meaningful decisions can be made regarding an applicant's qualifications and affords a basis for

10  monitoring that such qualifications are maintained during the life of the CCWP.  A local licensing

11  authority is more likely to be aware of incidents or facts that would render someone unqualified

12  for a CCWP and which constitutes information that may not be available to a licensing authority

13  in another county or at the state level, because it does not show up in any reporting database --

14  for example, police officer knowledge of domestic disturbance calls at an applicant's residence that

15  have not resulted in any actual prosecution or awareness of an applicant's gang associations or

16  other informal contact with law enforcement involving applicant behavior that has not resulted in

17  a criminal charge or prosecution.  *See* Bach v. Pataki, 408 F.3d 75, 92-94 (2d Cir. 2005)

18  (upholding a Privileges and Immunities Clause attack on New York's prohibition on nonresidents

19  carrying concealed weapons while in New York and finding the reasonable fit requirement

20  satisfied, because New York had an interest in monitoring those possessing CCWPs, which

21  included "an interest in the entirety of a licensee's behavior," and New York could "best monitor

22  the behavior of those licensees" who spent significant time in New York), *overruled on another*

23  *ground by* McDonald.  In Bach, New York argued that its residency requirement was substantially

24  related to its interest in monitoring those possessing CCWPs, reasoning:

25

26         The ongoing flow of information to a licensing officer as a result of the licensee's tie

27         to a particular residence or community is an important element of the State's

28         regulatory scheme.  It substantially increases the likelihood that a licensing officer

1    will be alerted to facts that cast doubt on a licensee's fitness to possess a firearm.

2

3    *Id.* at 92.  That rationale applies equally with respect to the Section 26150 residency requirement.

4

5    The second factor of intermediate scrutiny review does not require a perfect fit but, rather,

6    one that is reasonable.  As the Supreme Court has explained:  "The relevant inquiry . . . is not

7    whether the statute is drawn as precisely as it might have been, but whether the line chosen by

8    the California Legislature is within constitutional limitations." Michael M. v. Superior Court of

9    Sonoma County, 450 U.S. 464, 473 (1981) (plurality opinion).  "Intermediate scrutiny does not

10   require that [the challenged statute] be the *least* restrictive means of" meeting the governmental

11   objective.  Jackson, 746 F.3d at 966.  A challenged statute is appropriately narrowly tailored "'so

12   long as the . . . regulation promotes a substantial government interest that would be achieved less

13   effectively absent the regulation,'" and "[s]o long as the means chosen are not substantially

14   broader than necessary to achieve the government's interest, . . . the regulation will not be invalid

15   simply because a court concludes that the government's interest could be adequately served by

16   some less-speech-restrictive alternative." Ward v. Rock Against Racism, 491 U.S. 781, 799-800

17   (1989) (applying second factor in First Amendment context); *see* Jackson, 746 F.3d at 961

18   (explaining that, in analyzing the second factor, courts are "guided by First Amendment

19   principles").[22]

20

21   Here, the fit between the residence requirement and the government's objective is a

22

23   [22]    "[M]ost legislation will assert broad safety concerns and broad gun control measures
24   to match, covering both 'good' and 'bad' gun possessors and 'good' and 'bad' guns. Such
     legislation cannot be narrowly tailored to reach only the bad people who kill with their innocent
25   guns." Donald Dowd, *The Relevance of the Second Amendment to Gun Control Legislation*, 58
     MONT. L. REV. 79, 111 (1997) (explaining why requiring strict scrutiny review and a narrow
26   tailoring analysis is not feasible in most Second Amendment cases).  "[D]ue to the intensity of
     public opinion on guns, legislation is inevitably the result of hard-fought compromise in the
27   political branches.  To expect such legislation to reflect a tight fit between ends and means is
     unrealistic." Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 731
28   (2007).

reasonable one.   The residence requirement does not preclude any California resident from obtaining a CCWP, because under California law, every Californian has a domicile, regardless of how many homes he owns and in how many counties those homes are located.   The law simply requires that he submit his CCWP application to the county in which that domicile is located. While plaintiff may dispute the VCSO's conclusion that Ventura County is not plaintiff's place of domicile, plaintiff's disagreement with defendant's finding -- a finding this Court believes is appropriate under the evidence of record -- does not mean that the reasonable fit requirement is not satisfied.[23]  While the residence requirement may burden those persons who wish to submit CCWP applications in other counties perceived to more readily grant such permits, forum shopping would not appear to be a part of the core right of Second Amendment protection envisioned by the Supreme Court in Heller.

For these reasons, the Court concludes that the Section 26150 residency requirement -- both facially and as applied here -- is substantially related to an important government objective and is reasonably tailored to that objective.   Thus, that residency requirement withstands intermediate scrutiny.  No Second Amendment violation has been shown, and no triable issue of material fact exists in this respect.  As a result, plaintiff is not entitled to relief under 42 U.S.C. § 1983, as he has not shown a violation of his rights under the United States Constitution. Accordingly, defendant is entitled to summary judgment.

**CONCLUSION**

For the foregoing reasons, the Court concludes that:  plaintiff has not shown he is entitled to summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, and

---

[23]     Significantly, plaintiff's application for a CCWP submitted in Los Angeles County -- where his Santa Clarita home is located -- was not denied on the ground that he was not a resident.  Rather, it was denied based upon an interpretation of the "good cause" requirement that predated the Peruta decision.

accordingly, the Second Motion is DENIED; and defendant has established it is entitled to summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, and accordingly, Defendant's Motion is GRANTED.

IT IS ORDERED that this case is dismissed with prejudice.

Let Judgment be entered against plaintiff and in favor of defendant.

IT IS SO ORDERED.

DATED:  September 30, 2014.

*Margaret A. Nagle*

_____
MARGARET A. NAGLE
UNITED STATES MAGISTRATE JUDGE